**Richard Alan Abood LYON, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 08–92–00165–CR.

Court of Appeals of Texas,
El Paso.

July 22, 1994.

Rehearing Overruled Aug. 31, 1994.

Discretionary Review Refused
Dec. 21, 1994.

Mike DeGeurin, Foreman, DeGeurin & Nugent, Houston, for appellant.

John Vance, Crim. Dist. Atty., Kathi Alyce Drew, Asst. Dist. Atty., Dallas, for appellee State.

Before OSBORN, C.J., and BARAJAS and LARSEN, JJ.

## OPINION

BARAJAS, Justice.

This is an appeal from a jury conviction for murder. The court assessed punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice, and a fine of $10,000. We affirm the judgment of the trial court.

## I. SUMMARY OF THE EVIDENCE

Richard Lyon was charged with murdering his wife, Nancy Dillard Lyon. The application paragraph of the charge to the jury provided in relevant part:

> [I]f you find and believe from the evidence beyond a reasonable doubt that on or about the 14th day of January, A.D., 1991, in the County of Dallas and State of Texas, the defendant, RICHARD ALLEN ABOOD LYON, did intentionally or knowingly cause the death of one NANCY DILLARD LYON, an individual, by poisoning said NANCY DILLARD LYON with arsenic, a deadly weapon, as set forth in the indictment, you will find the defendant guilty of the offense of murder and so say by your verdict.

The evidence adduced at trial revealed that the victim, Nancy Dillard Lyon, became sick in the early evening hours of January 8, 1991. The following morning she was admitted to the emergency room of Presbyterian Hospital in Dallas, Texas, suffering from nausea, vomiting, and diarrhea. Her condition rapidly deteriorated and she was placed on a life support system. She died at about 3:30 p.m. on January 14, 1991. Her death was caused by arsenic poisoning.[1]

### A. The State's Case

At trial, the State called William Dillard, Sr., the victim's father. He related that his daughter initially met Appellant while both attended the Harvard School of Design. They married in 1982. At the time of her death, the victim and Appellant lived in a duplex on Shenandoah in the University Park area of Dallas County with their two young daughters.

Dillard related that his daughter and Appellant began to experience marital problems in the fall of 1989, at which time Appellant began seeing another woman. Appellant moved out of the family home in February 1990 and filed for divorce in September 1990. During the Christmas holiday of 1990, Appellant and his wife attempted a reconciliation, traveling to Connecticut to visit Appellant's parents.

Dillard testified that on January 9, 1991, he arrived at Presbyterian Hospital at about 8 a.m. He became concerned that his daughter might have been poisoned after receiving a call from her divorce lawyer advising that they should check for poison. His daughter's condition deteriorated until she became comatose. She continued in that state until Appellant decided to terminate her life support system. Dillard was upset that Appellant had initially made this decision without consulting other family members. The witness further testified that in the fall of 1990, Appellant had seemingly become very "materialistic" and was spending large sums of money on an automobile, golf clubs, travel and hotels, and jewelry for his new girlfriend. Dillard noted that in response to Appellant's new spending patterns, the victim changed their bank accounts, thus foreclosing Appellant's access to such accounts. After his daughter's death, he learned that she had changed the beneficiary of her $500,000 life insurance policy from Appellant to her two daughters.

On cross-examination, Dillard acknowledged an incestuous incident between the victim and her brother, Bill, Jr. when they were children. Dillard stated that there had been no intercourse and he characterized the incident as "playing doctor and nurse." The physician examining his daughter after this incident did not advise counseling. Additionally, the witness related that his son devel-

---

1. Dr. Jeffrey Barnard, the chief medical examiner for the county of Dallas, autopsied on the victim on January 15, 1991. An analysis of the victim's post-mortem blood revealed an elevated level of arsenic to between four to one hundred times above normal. Samples of liver and kidney tissues, fingernail and toenail clippings and hair samples revealed a markedly elevated level of arsenic. Dr. Barnard stated that the cause of death was arsenic poisoning, i.e., a homicide.

oped alcoholism as an adult. He went to a treatment program at Sierra Tucson Hospital. At a family therapy session at the hospital, the question of the incest was raised. Dillard stated he felt that this matter "was no big deal." Recently Bill, Jr. had experienced financial difficulties and his sister had loaned him $86,000. The witness identified various notes, each of which appeared to be in the handwriting of his daughter.[2]

Ali Bagheri, a resident physician at Presbyterian Hospital, testified that on January 9, 1991, he had occasion to treat the victim in the hospital's emergency room. She was in great pain and pleaded with him not to let her die. On initial examination in the emergency room, he found no obvious cause for the victim's distress; consequently, he consulted a number of physicians. Dr. Bagheri testified that he spoke with the victim, who related that in September, during a period when she was still separated from Appellant, she discovered a bottle of wine and an anonymous card on the front porch of her home. She told him that although the bottle appeared to have been tampered with she drank some of its contents, it tasted awful, and she soon became sick with nausea and vomiting. The victim told Dr. Bagheri of another incident that occurred after she and Appellant had reconciled. They went to the movies, Appellant bought her a soft drink which she spit out because of its taste. She looked in the cup and saw some white powder floating in the drink. She experienced vomiting, nausea, and diarrhea throughout the night. The victim additionally related that Appellant had been giving her vitamin

capsules, stating that she should take them as they were good for her health.[3] Finally, the witness related that in his observations of Appellant at the time of the victim's examination in the emergency room, Appellant did not seem to be very concerned with the situation. He was seen smiling, laughing, and joking with the doctors and nurses. It was Dr. Bagheri's opinion that Appellant's behavior was inappropriate as Appellant was fully aware that his wife was to be placed in the intensive care unit.

Nancy Lyon's divorce attorney, Mary Henrich, testified that she was retained in February of 1990. A petition for divorce was filed on September 25, 1990; however, the action was dismissed on January 2, 1991. Ms. Henrich, without objection, related a conversation wherein the victim stated that she was concerned that Appellant was trying to poison her.[4] The victim also told her attorney of an incident when Appellant was over at the house and was putting the children to bed. He had fixed her a drink, put it beside the bed, and told her the drink was there. She drank a little and went to bed. In the middle of the night, she became very sick. Henrich suggested that the victim either bring the wine to her office or turn it over to the police. However, the victim responded that it would be too embarrassing to go to the police and relate that she suspected her husband was trying to kill her.

Lynn Pease–Woods, nanny to the Lyons' children in 1987, testified that she became aware of the couple's marital problems after they returned from a trip to Santa Fe, New

---

**2.** The record reflects that Defendant's Exhibit 3 was a note which expressed her feelings for her brother, stating that her brother had violated her for years with the participation of another sister. Defendant's Exhibit 4, also appearing to be in the victim's handwriting, expressed a "fear of Bill and what his desires are, sex, sick sex, incest issues with me, my girls." Defendant's Exhibit 5, again appearing to be in the victim's handwriting, concerned her feelings for her father.

**3.** Dr. Bagheri testified that the incidents relating to the wine bottle and soft drink were mentioned to the victim's father, William Dillard, Sr. In response, the wine bottle and a sack containing various kinds of pills and capsules were brought to the hospital. None of these matters were purportedly discussed with Appellant.

**4.** Ms. Henrich's testimony parallels that of Dr. Bagheri in that Henrich was told by the victim that she had received a bottle of wine of a type that she particularly liked that appeared to have been tampered with. Likewise, the victim related the episode at the movies with Appellant where she asked him to get her a drink. The drink tasted strange but Appellant nonetheless insisted that she drink it. As in the case of Dr. Bagheri, Henrich was told by the victim that she saw something white floating on the top of the drink resembling aspirin, but that she did not drink the last of it. Additionally, the victim related to her attorney that Appellant had a "fit" but she did not drink the last of the drink.

Mexico. Pease–Woods related that the victim did not want a divorce and made efforts to be "the ideal wife." She related that she was present in the Lyon home when Nancy found the wine bottle on the front porch. Pease–Woods stated that she saw some pills, which looked "like horse medicine," at the victim's residence at a time Appellant was not living at home. She was told that the pills contained vitamins. These pills as well as the wine bottle were taken to the hospital and they were later turned over to the medical examiner.[5] Additionally, the witness related that there was no big problem with ants at the residence. She stated that although there was one small mound of fire ants in the yard, they just made trails and did not bite. Finally, Pease–Woods testified that she witnessed the signing of a document changing the beneficiary of Nancy Lyon's life insurance policy, and that several weeks after the victim died, she told Appellant that he should not be surprised if he found that the life insurance policy was changed. In response, Appellant purportedly stated, "Lynn, if Nancy was going to change the life insurance policy, she would have told me about it."

E.H. Forester, an assistant toxicologist with the Dallas Institute of Forensic Sciences, testified that he received various body tissue and fluid samples along with a container of pills and a bottle of wine. Forester testified that two of the pills contained barium carbonate, which, with ingestion of a sufficient quantity, can be lethal. An analysis of the wine failed to reveal the presence of any toxic substance. Forester found lethal levels of arsenic in the organ samples and elevated levels of arsenic in the victim's blood samples. Samples of the victim's hair provided by Lynn Pease–Woods, as well as from the victim's two children, revealed no elevated levels of arsenic.

Bruce Weale related that Appellant lived in the upstairs unit of a duplex located at 3616 Springbrook for about one year, during which time he lived in the downstairs unit. On August 17, 1990, Weale signed for a package addressed to Appellant. On August 21, 1990, he signed for three additional packages, and placed them in the entry hall leading to Appellant's duplex. These packages remained in the hall for some period of time and the witness became concerned because their labels stated they were chemicals and should be removed from the packages or kept refrigerated. A friend of Weale's took one of the packages to determine its contents but Weale noticed that the other packages had been picked up, the third package was returned unopened, and it was soon picked up.

Lisa Ann Struven, a receptionist at the offices where Appellant's business was located, testified that on December 27, 1990, she signed for some packages that United Parcel Service delivered for Appellant. She stated she followed the usual practice of calling business tenants to come get their packages or she would leave them in the mail room underneath the appropriate mail box. Ms. Struven testified that on May 21, 1991, she got a call from Appellant at her new place of employment, inquiring about statements she had previously given to the police. She testified that Appellant wanted to know what she and the police discussed. She stated that Appellant proceeded to tell her about the manner in which a package for him from UPS had been received. Finally, Ms. Struven testified that the conversation scared her.

Thomas L. Saba, a general contractor for various real estate companies, testified that he was employed to do a "make-ready" at a vacant duplex unit located at 3616 Springbrook. When he arrived at the premises, he found a number of personal items, including a plastic bag full of large, clear, empty capsules that would come apart. Saba also found a jar of store-bought vitamins in the kitchen similar to the empty capsules. Saba stated that there were no markings on any of the capsules and they all appeared to be of the same type.

Rose Ellen Rose, the operations manager for General Laboratory Supply, Inc., in Pasadena, Texas, testified that Appellant had

---

5. The record shows that the deceased had placed these items in a bag in Pease–Woods' car trunk prior to her leaving town when the witness was to look after the two daughters. The witness thought it was paperwork.

placed several orders with her company. On January 24, 1990, Appellant placed an order for 100 grams of lithium hydroxide monobasic. On August 8, 1990, he placed an order for 25 grams of barium carbonate, 25 grams of cyanogen bromide, 100 grams of lead nitrate, and 5 grams of nitroferrocyanide. The check in payment bore Appellant's signature and the order was shipped to 3616 Springbrook Avenue, Dallas, Texas with the notation, "attention: Richard Lyon." Ms. Rose further testified that on November 27, 1990, she once again spoke to Appellant, at which time Appellant placed an order for: four ounces of Congo red; one by four ounces of arsenic standard; sixteen ounces of alcohol ether; one each of arsenic; one by one-hundred and twenty-five grams of arsenic trioxide; and one by one-hundred grams of triphenolphosphine. Appellant mailed a check that bore the notation "fire ant poison," for the purchase price of $270.45. The order was shipped to Appellant, delivered on December 27, 1990 and signed for by "L. Struven."

Donald S. Ortega, a detective with the Dallas Police Department, testified he was lead investigator in the Lyon case. On February 27, 1991, he interviewed Appellant at the Crimes Against Persons Office of the Dallas Police Department. During the interview, Ortega asked Appellant if he knew of any poisons his wife might have come across. Appellant responded that he had Vapam, a herbicide, and Amdro, an ant killer, in his garage. Ortega asked Appellant if he had purchased chemicals and he responded that he had not. Upon further police questioning, he responded that he did buy mercury and lead to repair a battery. He stated he could not remember the name of the company but he spoke with someone named Rose. After further questioning, he stated that he purchased cyanide in August 1990 in order to kill fire ants in his backyard and at a job site. He stated he purchased arsenic acid in liquid and powder form in November or December 1990. Appellant told Ortega that he had disposed of all the chemicals, without ever

using them, by placing them in a trash bag to be picked up. Detective Ortega also inquired whether Appellant knew Tammy Ayn Gaisford. He related that he had seen her the previous night and had recently traveled with her to Puerto Vallarta, Mexico. When Ortega informed Appellant that his wife had been poisoned, he remained calm and gave no response. He asked no questions. Appellant allowed the police to search his home and vehicles but they found no chemicals other than Amdro. Ortega testified to receiving a letter implicating the victim's brother in her death but no further information developed regarding the letter. Ortega also said that Appellant's attorney gave him a recording from Appellant's answering machine with a male voice saying something to the effect of, "you're next."

Tammy Ayn Gaisford testified she met Appellant in June 1989 in Houston, Texas, and became intimate with him in September 1989. In October 1989, she moved to Dallas. The witness related that she traveled with Appellant and had received gifts from him. Gaisford began to think more seriously concerning her relationship with Appellant when he moved out of the home on Shenandoah and stated they casually discussed marriage several times. She testified that she thought the victim feigned illness in order to manipulate Appellant and Appellant would go to her when she told him she was sick. The witness stated this pattern was repeated at least ten times during the course of her relationship with Appellant.

Stephanie Bates testified that she moved into Appellant's former duplex at 3616 Springbrook in early February 1991. In June, while cleaning, she found a bottle of pills in the far back of a lower cabinet in the bathroom. Nancy Lyon's name was on the label that indicated it was a prescription for Keflex. Inside were two white tablets and two blue capsules. The bottle was collected by Detective Dennis L. Williams.[6]

E.H. Forester, the toxicologist who testified earlier in the trial, stated that he exam-

**6.** The prescription bottle was labeled Revco No. 166022 and was dated March 29, 1990. It was made out to Nancy Lyon for "20 caps of Keflex, 250 milligrams." The bottle contained two caplets marked LL and C81, two white and green capsules marked, "Dista H69, Deflex 250," and one blue capsule marked "Sleepinol".

ined the pills found in the aforementioned bottle. The witness stated that the contents of the green and white capsules were reddish in color which is not the normal white color of Keflex. He stated that they contained sodium nitroferrocyanide. Forester related that this substance is used in medicine to reduce high blood pressure. It is used only intravenously. One pill was 48 percent sodium nitroferrocyanide and the other was 18.9 percent. The caplets were Keflex. The witness testified that in high doses or when given intravenously over a long period of time, sodium nitroferrocyanide can break down and produce cyanide. He stated the amount found in the pills would not be toxic and he was unable to state what number of pills would have to be ingested orally to produce a toxic effect.

The State finished by calling Stan Wetzel, owner of Lambert Landscape Company, who testified that in the early fall of 1990 he formed a company called Architectural Site Services. Appellant was hired to operate this company. Wetzel stated that after Nancy Lyon's death, he heard rumors that Appellant purchased arsenic. When he asked Appellant about this, Lyon denied buying any arsenic. When questioned by the police, Wetzel stated that his company used an organic product called "Logic" to control fire ants; his company had been totally organic for at least a year and a half prior to the victim's death. When asked about this, Appellant told Wetzel that he had fire ant problems at home and at several rental houses and that he had been experimenting with various chemicals to eradicate them.

### B.  The Appellant's Case

Appellant presented an extensive defense. Norman Jack Amps, the director of Trinity Episcopal Church, stated he visited Nancy Lyon several times during her hospitalization. He also counseled Appellant before the funeral and in the weeks following, advising him that he should not reproach himself for wanting female companionship, and not to think that such a relationship would be the "next level of his life."

Susan and Bill Hendrickson, the victim's sister and brother-in-law, both testified at trial. They testified that Nancy Lyon found a canceled check made out to General Lab in February 1990. She discussed this with the Hendricksons, questioning whether it might mean Appellant was involved in drugs. Hendrickson called the company and was informed they sold plastics and chemicals. He called his sister-in-law and told her, "it wasn't what they thought it might be." He stated that he knew of no animosity between the victim and her brother or between his wife and the victim. Susan Hendrickson also testified that she knew of no animosity between the victim and family members. In February or March of 1990, the victim told her that their brother Bill, Jr., had come into Nancy's room and touched her when she was young. The witness testified she had never seen this type of behavior in the home when she was growing up.

Kathleen Elizabeth Cunningham testified that she worked with Nancy Lyon when they were both employed with the Trammel Crow Company. The witness related that the victim, who was project manager for a development in Grand Prairie, worked for an individual named David Bagwell. A legal dispute developed between Bagwell and the company over $750,000 that had been moved into Bagwell's account. Nancy Lyon was deposed and was to be a witness in the case. Cunningham testified that on October 16, 1989, both she and Lyon received letters warning them to stay out of the Bagwell case.

Heather Forward testified that Appellant had hired her as his divorce attorney. She related that upon receiving a letter from Appellant asking that the divorce be dismissed; on December 28, 1990, she filed a motion to dismiss the petition for divorce.

Richard Evarts related that he attempted to mediate the divorce between the parties. He received a letter from Appellant in September 1990 stating that he and his wife had decided to enter counseling.

Kelly Olivares testified that she was the manager of a Mexican import store. She testified that Nancy Lyon bought some items at the store and had looked at a stone angel but had not wanted to spend the money. On December 19, 1990, Appellant came to the

store and bought the angel and had it delivered to the Shenandoah address.

Bruce Francis Berger testified that he was the principal of the Armstrong–Berger landscape architectural firm where Appellant worked as project manager and general contractor for a residential project in north Dallas. After being questioned by police, it came to Berger's attention that there was a fire ant problem at the residential project. He identified several photos depicting that problem. Berger stated that he was aware of a fire ant infestation problem in Appellant's backyard at the residence on Shenandoah. He identified several photos showing the problem in Appellant's backyard. Berger stated that he spoke to Appellant regarding arsenic and Appellant told him he purchased chemicals but had never possessed arsenic.

Appellant took the stand on his own behalf. He testified he did not murder his wife and had nothing to do with her death. He testified that David Bagwell was his wife's boss on a real estate development called "Westchester" in Grand Prairie, Texas. His wife thought that Bagwell acted like a "Dr. Jekyll and Mr. Hyde." She was a witness in litigation between the Trammel Crow Company and Bagwell concerning a transfer of $750,-000. During that time, she received a letter stating, "Stay out of the Bagwell case or you and your family will face the wrath of God." Appellant testified that over Memorial Day 1989, the Dillard family went to Sierra Tucson Hospital. There, his wife consulted a sex therapist to discuss her sexual intimacy problems and the incest with her brother. This topic later came up at a family group session. Appellant testified that these revelations disgusted and repulsed him. He and his wife were not intimate for many months after this disclosure.

In June 1989, Appellant met Tammy Ayn Gaisford in Houston, Texas. She was in charge of a project that Appellant was working on. In September 1989, they began an intimate relationship. Appellant traveled with his wife to Santa Fe, New Mexico in November 1989. Appellant testified that Nancy Lyon was pregnant although she did not know it at that time. Traveling home, Appellant told her of his relationship with Gaisford which greatly upset her. She miscarried in late November.

Appellant stated he first dealt with General Laboratory in Houston in November 1988 when it became necessary to remove some hydraulic fluid from the columns and sidewalk of a project building. Appellant stated that during his separation from his wife, he started working on various projects and ideas. One such project was a liquid battery intended to eradicate fire ants. Appellant contacted General Laboratory for ideas on this battery. He ordered lithium hydroxide and mercury for use with the battery. He also ordered lead nitrate for the same purpose. Appellant stated that he also had a project regarding ant poison. He ordered barium carbonate, cyanide bromide, and sodium nitroferrocyanide to try as ant poisons. Appellant stated that his wife knew of his attempts to find a solution to the fire ant problem; she made suggestions including the use of arsenic as an ant poison. He testified that one set of his plans contained the notation by his wife, in her handwriting, that "maybe the sprayer could be connected to the drill."

Appellant stated there was a fire ant problem at both the Shenandoah residence and his residential business project. The ants bit his children. He testified that he placed an order for arsenic in late November 1990, but that he never received it.

On January 8, 1991, Appellant had planned a trip to Houston to collect soil samples. As he left the home to make an 8 a.m. flight, he drank some bad-tasting coffee. He returned to Dallas at 2:45 p.m. He went to a job site and then attended a seminar. He called his wife on the phone to inform her he would be late as she had a counseling session at 6 p.m. Upon his arrival home, they greeted each other and she stated she was not feeling well. He suggested she not go to her meeting and she finally agreed. Appellant called Family Recovery to tell them she would not be there and he fed the children. He checked on his wife and found that she had vomited. He put a wet towel on her neck and she seemed better. He placed a second call to his wife's gynecologist around 9 p.m. after she vomited

again. Her doctor returned the call, and diagnosing food poisoning, prescribed a suppository. Appellant obtained this prescription at 10:45 p.m. His wife was experiencing diarrhea; he again called the doctor and they made the decision to take Nancy to Presbyterian Hospital. They arrived at the hospital at 1 a.m.

Appellant related that his wife was sick ten to twelve times during the year they were separated. He testified that on August 24, 1990, he and his wife had dinner out and each imbibed two martinis during dinner. They went to a movie and he bought a diet Dr. Pepper for his wife. She complained it tasted "funny" and he tasted it and agreed it tasted odd. He exchanged the soft drink for another which she drank. Appellant stated that he did not force her to drink the first soda. The next day his wife told him she had gotten sick during the night. He assumed she had gotten sick from the martinis and French food they had at the restaurant.

Appellant identified Defendant's Exhibit Fourteen as a typewritten, signed letter to him from his wife dated November 1, 1990. This letter changed the beneficiary on Nancy Lyon's insurance policy from Appellant to their daughters. He stated they had no other discussions about changing their wills or any other such matter. Appellant testified that he and his wife went on a ski trip to Steamboat Springs, Colorado in December 1990. At that time, she was taking Keflex in capsule form for an unspecified ailment. She was also taking "iron, or some other pill." His wife complained the drug upset her stomach. She ran low on the prescription and it was renewed at a smaller dosage in a tamper-proof caplet form. Appellant stated that he had seen the anonymously sent bottle of wine. The top of the bottle looked suspicious. He denied sending the bottle to his wife. Finally, Appellant testified that he did not leave any capsules at the Springbrook residence. He stated there were some clear capsules at the Shenandoah house that his wife filled with psyllium seed husks to clean her colon.

Marvin Morgan testified he was a questioned document examiner from the Bexar County Forensic Science Center in San Anto-

nio. He utilized known examples of the victim's handwriting in examining thirty-seven questioned documents. These examples were a series of checks signed "Nancy Dillard Lyon," as well as a letter from the victim to Appellant that began, "Dearest Richard." He compared the known writings to a series of documents. One such document was a typewritten letter signed "Nancy" advising Appellant that she had changed the beneficiary on her life insurance policy. Morgan examined handwriting on a drawing of Appellant's plans for a fire ant eradicator which had the handwritten notation, "maybe the sprayer could be connected to the drill." He positively identified these documents as written by the victim. He examined a note dated August 8, 1990 which read, "call General Lab," a notation on a General Laboratory invoice, "call 340–4345 directory of chemical products," and a drawing that stated, "Maybe the sprayer could be connected to the drill." In each case, he found the handwriting matched that of the victim. He also examined the signature "Nancy Lyon" on an invoice from Chemical Engineering and came to the same conclusion. Among other documents, the witness examined a writing "fear of Bill and what his desires are—sex—sick sex—incest issues with the girls," and made a positive identification. During cross-examination, the witness stated that he based his testimony on handwriting examples given to him by Appellant's attorney. He did not examine any of Appellant's known writing.

Charles Couch testified he was president of a company called Chemical Engineering. He stated he received a call from a woman in late August or early September 1990 who wanted a safe ant killer. He never saw this person and could not remember her name. Couch offered to do some research for her at the Southern Methodist University library. He did so and wrote the formula on a pad that had "Chemical Engineering" at the top. Arsenic trioxide was part of the formula. The woman-caller stated that she lived near SMU and she and her husband had devised an instrument to put ant poison directly into ant beds. Couch advised caution. The following day, she called to see if he had done the research. She later picked up the formu-

la. Couch did not see her. He identified a form as being on the letterhead of Chemical Engineering. Couch testified that he told the woman caller that he did not sell the items contained in the formula.

James C. Garriott testified he was the chief toxicologist at the Bexar County Forensic Science Center in San Antonio. He reviewed the forensic evidence submitted in the case. He testified that the victim suffered a very severe exposure to arsenic close in time to her hospital admission. He further stated that based on neutron actuation hair analysis, she suffered a separate arsenic exposure two to five weeks prior to the fatal exposure. He also observed that the victim's fingernail clippings contained six times the amount of arsenic found in her toenail clippings, indicating the victim had been touching arsenic with her hands.

Robert Geffner, a psychologist and professor at the University of Texas at Tyler, testified without objection. He stated that he specialized in counseling incest survivors. He reviewed a number of Nancy Lyon's writings, which he believed manifested the characteristics of an incest survivor. These characteristics included guilt, fear, shame, anger, depression, fears of abandonment, and feelings of inadequacy. The witness stated that the victim was certainly an incest survivor and she had been subjected to incest over a long period. He also stated that the victim had recurring thoughts of suicide. The witness concluded that Nancy Lyon's family denied the incest and that her brother was its perpetrator.

James P. Grigson, a psychiatrist, examined numerous writings of the victim. From these writings he gleaned that Nancy Lyon was a very troubled individual as a result of her childhood. She harbored great anger and resentment toward her father; their relationship was very cold. She had great anger toward her brother because of the incestuous relationship. Grigson described the victim as calculating, controlling, and manipulative. He characterized her actions in telling Appellant she was sick and needed help as a form of control. In examining her writings, Dr. Grigson concluded that Appellant had given Nancy Lyon love and family

and an acceptance of her sexual "hangups." He opined that she would go to any length not to lose him. The witness stated that Nancy Lyon "probably" used arsenic as a means of becoming ill and manipulating Appellant. He testified that she acted irrationally in not taking the suspicious wine to her divorce attorney and in placing the wine and pills in Lynn Pease–Woods' car trunk. During cross-examination, Dr. Grigson stated that his opinions were based on conversations with Appellant, newspaper accounts, and on other writings given to him. He never met Nancy Lyon.

### C. The State's Rebuttal

On rebuttal, the State utilized the testimony of Hartford R. Kittel, a document examiner. He examined a collection of writings attributed to Nancy Lyon, which he compared to some of her known writings. He also compared the purported writings to Appellant's known writings. The witness examined the writing that indicated "fear of Bill." He stated that most of the writing was the victim's but that some of the writing belonged to Appellant. That portion of the writing was, "fear of reprisal ... fear of Bill and what his desires are—sex—sick sex—incestuous w.i. me?—My girls?" He examined the note stating the victim's brother had violated her for years with the participation of her sister and concluded the writing was entirely in the handwriting of Appellant. He examined the writing where she expressed her feelings for her father and concluded that it was entirely in the handwriting of the victim. He was unable to express an opinion with regard to various other writings purported to be writings of the victim.

Vincent P. Guinn, a professor of chemistry and nuclear engineering, testified that he had specific expertise in hair analysis. He conducted neutron analysis on some sample hairs of the victim. His analysis revealed that the victim has been exposed to arsenic three times. The first exposure, a minor one, occurred seven and one-half to ten weeks prior to her death. The second ingestion, a mid-level exposure, occurred two and one-half to five weeks prior to death. The third ingestion was 'tremendously high'

and happened at some time two to two and one-half weeks prior to her death. Guinn stated that he could not pinpoint exactly when that exposure occurred.

Dr. Thomas Lee Kurt, a toxicologist with the Poison Control Center at Parkland Memorial Hospital, testified that in his opinion, the victim's poisoning was acute as opposed to chronic poisoning; "there was a sudden onset of an acute type of poisoning, particularly where she had the rising water stools and went into shock." He explained that chronic poisoning has symptoms such as rashes and numbness in the hands and feet. In the witness's opinion, the poison was administered within a day prior to her hospital admission and probably within a few hours. He further testified that barium carbonate is toxic, makes a person feel weak and nauseous and vomiting can be associated with its ingestion. Kurt stated that intentional arsenic poisoning as a means of suicide is unlikely because of the common knowledge that it is a miserable way to die.

Amy William Monier, a close friend of the victim, stated that Nancy Lyon was absolutely devastated by her marital problems. However, she began to feel stronger about herself and that while the victim was going to try to work out her marital problems, it would be on her terms. Monier testified that the victim never mentioned any incestuous relationship with her brother; to the contrary, she had a very close relationship with all of her family and was very close friends with her brother. The witness related that the victim mentioned in the fall of 1990, Appellant was giving her vitamins. She thought this strange because she felt it did not comport with his actions and attitudes

toward his wife. The victim never mentioned to her that she thought she was being poisoned. Nancy Lyon had been to the doctor the morning of her hospitalization and was angry because she felt Appellant had given her herpes.[7] Otherwise, she appeared in good health. The witness also stated that she never knew the victim to type anything.

Finally, the State in rebuttal called John Reamer, the owner of Custom Chemical. He testified with regard to the invoice for various chemicals.[8] He stated he did not make the sale reflected in the invoice, nor did he ever know Chemical Engineering to sell any of the chemicals. Additionally, he testified that Charles Couch handwrote his invoices. Reamer stated that his typewriter did not produce the exhibit.

## II. DISCUSSION

### A. Sufficiency of the Evidence

■ In Point of Error No. One, Appellant asserts that the evidence was insufficient to sustain the verdict. In reviewing the sufficiency of the evidence to support a criminal conviction, we are constrained to view all the evidence in a light most favorable to the verdict to determine whether any rational trier of fact could find the essential elements of the crime as alleged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Geesa v. State*, 820 S.W.2d 154, 159 (Tex.Crim.App.1991);[9] *Nevarez v. State*, 847 S.W.2d 637, 643 (Tex.App.—El Paso 1993, pet. ref'd). Our role is not to ascertain whether the evidence establishes guilt beyond a reasonable doubt. *Stoker v. State*, 788 S.W.2d 1, 6 (Tex.Crim.App.1989), *cert.*

---

7. The record shows the deceased had recently suffered from a vaginal rash.

8. The record shows that Exhibit 97 was an invoice dated September 6, 1990, typed on Chemical Engineering stationery which listed the chemicals barium carbonate, lead nitrate, cyanogen bromide, and arsenic trioxide. The notation "prepaid" followed each entry. At the bottom of the invoice was the handwritten "Nancy Lyon" and a Texas driver's license number. This exhibit was introduced during the Appellant's testimony. Appellant testified that he found the invoice in a file in the house.

9. In *Geesa*, the Court of Criminal Appeals abolished the use of the analytical construct in circumstantial evidence cases to determine whether the circumstantial evidence excludes every reasonable hypothesis other than the guilt of the accused. *Geesa*, 820 S.W.2d at 161. The court also mandated that the jury be given an instructional definition of reasonable doubt. *Id.*, at 162. The *Geesa* case was decided on November 6, 1991 and was effective from that date. *Id.*, at 165. The present case commenced in the latter part of November 1991. The jury was instructed regarding reasonable doubt.

*denied,* 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990). Nor do we resolve any conflict of fact or assign credibility to the witnesses as it was the function of the trier of fact to accept or reject any, part, or all of any witness's testimony. *See Adelman v. State,* 828 S.W.2d 418, 421 (Tex.Crim.App. 1992). Instead, an appellate court's duty is only to determine if both the explicit and implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial in a light most favorable to the verdict. *Adelman,* 828 S.W.2d at 421–22. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. *Matson v. State,* 819 S.W.2d 839, 843 (Tex.Crim.App. 1991), *quoting Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988).

■ The corpus delicti of murder is established if the evidence shows (a) the death of a human being (b) caused by the criminal act of another. *Fisher v. State,* 851 S.W.2d 298, 302 (Tex.Crim.App.1993); *Jackson v. State,* 652 S.W.2d 415, 419 (Tex.Crim.App.1983). Appellant maintains that the second element has not been demonstrated in this case. We disagree.

■ The evidence in this case was closely and hotly contested. Appellant asserts there were a number of other possibilities explaining the victim's death other than a criminal act on his part: he suggests suicide, accidental poisoning, or random poisoning as possibilities. Appellant also implicates other individuals: the victim's brother, David Bagwell, and Tammy Ayn Gaisford. The question before us, however, is whether in viewing the evidence in a light most favorable to the verdict, a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Geesa,* 820 S.W.2d at 159. We leave questions of credibility for the trier of fact. *Adelman,* 828 S.W.2d at 421.

Here, the jury could have reasonably believed that Appellant engaged in a pattern of conduct leading to the acute arsenic poisoning of his wife. If the State's evidence is accepted, Appellant believed that Nancy Lyon's insurance policies still named him as beneficiary. Appellant demonstrated a jocular lack of concern toward his wife's condition at the hospital, notwithstanding her terrible illness. She related to both her attending physician and her attorney that she thought she had been poisoned and related specific instances leading to her suspicion. These accusations were buttressed by physical evidence linked to Appellant which demonstrated tampering with various capsules, coupled with evidence that Appellant was urging the victim to take these capsules. There was evidence that Appellant was evasive or downright untruthful when questioned by various people concerning his purchase of arsenic. There was evidence that he ordered and received this arsenic. One witness felt threatened by Appellant's post-arrest assertion that she must remember he had complained about not receiving the package containing the arsenic. Evidence was presented that the fatal poisoning could have occurred at a time when Appellant was at home with his wife, their children being the only others present. There were also indications that Appellant forged documents buttressing his defensive theory that the victim committed suicide. We find there was sufficient evidence to support the conviction. Appellant's Point of Error No. One is overruled.

## B. Newly Discovered Evidence

In Point of Error No. Two, Appellant contends that the trial court erred in overruling his motion for new trial based on newly discovered evidence. Marvin Morgan, testifying for the defense, identified various documents as being in the handwriting of the victim. This testimony was rebutted to some extent by the State's handwriting expert, Hartford R. Kittel. On February 14, 1992, at the hearing on the motion for new trial, Appellant's trial attorney testified that after trial, he discovered fifty-two pages of documents that Appellant had provided him prior to trial. An additional document, a wedding list partially in the victim's handwriting, was provided. Appellant's probate attorney had given him the list while he was in jail following the trial. The trial attorney sent these documents to Marvin Morgan and to Steven Cain, another handwriting expert. Al Leightner, an ink examiner, was also consulted. Both experts testified that given this

additional material, they could refute Kittel's conclusions.

A new trial shall be granted an accused where new evidence favorable to the accused has been discovered since trial. Tex.R.App.P. 30(b)(6).[10] Motions for new trial based upon the alleged discovery of new evidence traditionally lack favor with the courts and are viewed with cautious scrutiny. *Drew v. State*, 743 S.W.2d 207, 225 (Tex. Crim.App.1987); *Martinez v. State*, 824 S.W.2d 688, 692 (Tex.App.—El Paso 1992, pet. ref'd). The trial court's ruling on a motion for new trial will not be disturbed absent a clear abuse of discretion. *Jones v. State*, 711 S.W.2d 35, 36 (Tex.Crim.App. 1986); *Martinez*, 824 S.W.2d at 692. There are four requirements for obtaining a new trial based on newly discovered evidence:

- the evidence was unknown to the movant-defendant at the time of trial;
- the failure to discover the evidence was not due to the movant-defendant's want of diligence;
- the evidence is admissible, and not merely cumulative, corroborative, collateral or impeaching;
- the evidence is probably true and will probably bring about a different result on another trial.

*Eddlemon v. State*, 591 S.W.2d 847, 849 (Tex. Crim.App.1979); *Martinez v. State*, 824 S.W.2d at 692. Further, if the newly discovered evidence is of questionable weight and credibility, and would probably not bring about a different result upon new trial, the court does not abuse its discretion in refusing a new trial. *Jones*, 711 S.W.2d at 37.

Initially, Appellant urges this Court to abandon the above-stated diligence requirement and hold that Tex.R.App.P. 30 has only two prongs: (1) the evidence must be newly discovered, and (2) it must be favorable to the accused.[11] In *Meriwether v. State*, 840 S.W.2d 959, 962 (Tex.App.—Beaumont 1992, pet. ref'd.), the Court reasoned that there was a significant difference between the terms "material" and "favorable" and held that a movant need only establish the two prongs suggested by Appellant. *Id.* at 962. However, the Court stated that the necessity to show due diligence was a subset of the first prong. *Id.* at 962 n. 6. Appellant maintains that we should adopt the *Meriwether* formulation absent the due diligence requirement. We are not inclined to do so and we adhere to the prior case law of this Court requiring the four traditional elements. *Saenz v. State*, 840 S.W.2d 96, 101 (Tex. App.—El Paso 1992, pet. ref'd); *Martinez v. State*, 824 S.W.2d at 692; *Isaacs v. State*, 770 S.W.2d 76, 80 (Tex.App.—El Paso 1989, pet. ref'd).

Next Appellant urges, as a policy matter, that any question on newly discovered evidence in a motion for new trial should be resolved in a defendant's favor due to the uncertainties of the post conviction process. Appellant makes specific reference to the United States Supreme Court's holding in *Herrera v. Collins*, —— U.S. ——, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) that newly discovered evidence, sufficiency of the evidence, and even actual innocence, are not grounds for federal habeas corpus relief. We acknowledge the limitations of collateral attack on convictions in the federal system, but also note the ameliorative holding in *Holmes, et al. v. Third Court of Appeals*, 885 S.W.2d 389 (Tex.Crim.App.1994) wherein the Court of Criminal Appeals held that claims of factual innocence based on newly discovered evidence are cognizable in post-conviction writs of habeas corpus in state appellate courts.[12]

---

10. Tex.R.App.P. 30(b)(6) was disapproved by the Legislature pursuant to Tex.Gov't Code Ann. § 22.108(b), effective September 1, 1993. Act 1993, 73rd Leg., ch. 900, § 11.02. Further, the Legislature replaced Rule 30(b)(6) with Tex.Code Crim.Proc.Ann. art. 40.001 which restores the word "material" to the language of the statute. Because Appellant was convicted of an offense committed prior to the effective date of Article 40.001, we are obligated to apply former Rule 30(b)(6).

11. The prior statute, Tex.Code Crim.Proc.Ann. art. 40.03, repealed Acts 1985, 66th Leg. ch. 685, § 4 eff. September 1, 1986 stated that new trials should be granted where new evidence material to the defendant has been discovered since the trial.

12. The Court of Criminal Appeals, in *Holmes*, held that "an applicant seeking habeas relief based on a claim of factual innocence must, as a threshold, demonstrate that the newly discovered

Lastly, Appellant asserts that he demonstrated due diligence with regard to the discovery of the newly discovered evidence. We cannot agree. The testimony on motion for new trial established that all the "newly-discovered" documents, save the wedding list, were in the possession of the defense prior to trial. Clearly, Appellant has failed to demonstrate due diligence with regard to those documents. With regard to the wedding list, that document was written by two or three individuals. Marvin Morgan stated that he found some "backward loops" in the F's on the list. While this would tend to refute Hartford Kittel's testimony that only Appellant utilized such loops, it would not discredit other aspects of his analysis such as the differing I's and differences in the words "hurt" and "about". We find that the utilization of this document would not have brought about a different result upon a new trial. Accordingly, Point of Error No. Two is overruled.

### C. Ineffective Assistance of Counsel

#### 1. Standard of Review

In Points of Errors Nos. Three and Four, Appellant asserts that he was denied effective assistance of counsel in violation of the State and Federal Constitutions. Successful claims of ineffective assistance of counsel must first demonstrate that counsel was not functioning as counsel guaranteed by the Sixth Amendment in providing reasonably effective assistance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). The second prong of this test requires a showing that counsel's errors were so serious as to deprive Appellant of a fair trial, such that there arises a reasonable probability that but for counsel's unprofessional errors, the results would have been different. Reasonable probability is a likelihood sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. Texas adopted this test in *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex.Crim.App.

1986). *See also McFarland v. State*, 845 S.W.2d 824, 842 (Tex.Crim.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993). The constitutional right to counsel does not mean errorless representation. In order to meet the constitutional standard, counsel must provide reasonably effective assistance. *Wilkerson*, 726 S.W.2d at 548. In reviewing these assertions, the **totality** of representation is examined as opposed to focusing upon isolated acts or omissions. Ineffective assistance of counsel cannot be established by isolating or separating out one portion of the trial counsel's performance for examination. *Bridge v. State*, 726 S.W.2d 558, 571 (Tex.Crim.App.1986). In that regard, this Court, on review, will not engage in hindsighted comparisons of how other counsel, in particular appellate counsel, might have tried the case. *See Wilkerson*, 726 S.W.2d at 548. A fair assessment of trial counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances at trial, and to evaluate the conduct from counsel's perspective at the time. *Stafford v. State*, 813 S.W.2d 503, 506 (Tex. Crim.App.1991). We must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance. The Appellant must overcome the presumption that under the circumstances at trial, the challenged action could be considered sound trial strategy. *Strickland*, 466 U.S. at 688–89, 104 S.Ct. at 2064–65, 80 L.Ed.2d at 693–95, *Stafford*, 813 S.W.2d at 506. Consequently, allegations of ineffectiveness of counsel must be firmly founded by the record. *Hawkins v. State*, 660 S.W.2d 65, 75 (Tex.Crim.App.1983); *Mercado v. State*, 615 S.W.2d 225, 228 (Tex. Crim.App.1981). The burden is upon Appellant to establish ineffective assistance of counsel by a preponderance of the evidence. *Williams v. State*, 837 S.W.2d 759, 761 (Tex. Crim.App.1992).

#### 2. Pre-trial Preparedness

In attempting to advance his claim of ineffective assistance of counsel, Appellant

---

evidence, if true, creates a doubt as to the efficacy of the verdict sufficient to undermine confidence in the verdict and that it is probable that the verdict would be different. Once that threshold has been met, the habeas court must afford the applicant a forum and opportunity to present his evidence." *Holmes, et al. v. Third Court of Appeals,* at 398.

first asserts that trial counsel was not prepared; Appellant contends that counsel failed to familiarize himself with documents in his possession before trial. Appellant maintains that but for counsel's error, Marvin Morgan could have rebutted Hartford Kittel's testimony linking Appellant to forgery, testimony extremely damaging to the defense.

We note the following excerpt from Appellant's brief in his discussion of the preceding point of error:

> Consider that from the appellant's perspective: the State brought in an expert witness at the last minute. The appellant had no notice that a witness like Hartford Kittel would be presented, let alone who such a witness would be. The State, like the appellant, "could have called in any experts they wanted to", so the appellant could hardly be expected to know what rebuttal witness would be called and have a ready-made response to whatever opinion the State's expert would render. Least of all could the appellant be expected to anticipate a hypothesis that the accused committed the extraneous felony of forgery (and, for good measure, the felony of perjury), particularly after Nancy's father identified the handwriting on the controversial documents as Nancy's.

This discussion illustrates the difficulty faced by trial counsel. Trial counsel could not have reasonably anticipated this testimony. Counsel supplied numerous documents to his expert for analysis and that events took a disadvantageous turn at trial does not, by itself, warrant a finding of ineffective assistance.

### 3. Conflict of Interest

■ Next, Appellant asserts that trial counsel's pre-trial press conference undercut the possibility of a change of venue and distracted counsel from the merits of the case when the State tried to disqualify him on grounds that he might be a potential witness.

Initially, we note that Appellant has failed to provide this Court with the tapes of the press conference held on March 22, 1991. Our review of this contention is limited by the absence of such evidence. TEX.R.APP.P. 50(d).

Trial counsel did not request a change of venue. In *Majid v. State*, 713 S.W.2d 405, 413 (Tex.App.—El Paso 1986, pet. ref'd), this Court held that pre-trial publicity supportive of a defendant's tactical posture at trial does not warrant a finding of ineffective assistance in failing to seek a change of venue. Without reviewing what was said at the press conference, we are unable to conclude that the *Majid* case is applicable here. Nonetheless, the record, in the instant case, fails to establish that a change of venue was appropriate and, on this record, we will not second-guess trial counsel's decision in this area.

### 4. Voir Dire

Appellant's second contention is that trial counsel was distracted during *voir dire*. Appellant premises this assertion on certain events that occurred during a pre-trial hearing where the State maintained that counsel waived the attorney-client privilege by giving a press conference. The prosecutor maintained that she could call trial counsel as a witness and this constituted a conflict of interest. At a hearing on the matter, Appellant waived any conflict of interest. The State never attempted to call defense counsel as a witness. Further, the record is devoid of any indication that trial counsel was distracted at *voir dire*. We find this contention to be wholly without merit.

■ Appellant contends that trial counsel's performance was deficient in four instances during *voir dire*. The first contention is that trial counsel failed to reurge his motion to shuffle the jury panel. Appellant suggests that had the panel been shuffled, this might have obviated the difficulty encountered later when a seated juror stated objections to serving on the jury due to the possibility of losing his job. Faced with this dilemma, trial counsel conferred with Appellant and both sides agreed to excuse the juror. The difficulty with this juror occurred after the jury was seated. It is evident that the decision to shuffle the jury is a tactical decision based upon experience and observation. It is speculative to assert that the problem with the juror would not have arisen

but for trial counsel's not renewing his motion to shuffle the jury panel. There is no showing that this constituted ineffective assistance.

■ Appellant next maintains that trial counsel was deficient in failing to object to the absence of one of the prosecutors during *voir dire*. The trial judge asked the jury panel if anyone knew the prosecutor, spelled her name, and stated her gender. Appellant contends that as a result of this, there was no way to ascertain whether a venireperson would recognize her by her appearance rather than by her name and there was no way to observe the demeanor of venire members regarding their rapport with the prosecutor. Appellant suggests that the absence of the prosecutor during *voir dire* was harmful because she personally vouched for the credibility of a witness during closing argument. There is nothing in the record to show any impact the prosecutor's absence had upon the jury. Further, it is not possible from the record to determine if trial counsel had some strategic purpose in not requiring her presence. A second prosecutor conducted *voir dire* and there is no indication the absent prosecutor would have been involved in the *voir dire* had she been present. Again, we are asked to question trial counsel's effectiveness based upon unforeseen eventualities that could not reasonably be anticipated. We find that these assertions do not support a claim of ineffective assistance of counsel.

■ Appellant's third assertion of ineffectiveness, at *voir dire*, centers upon a number of instances where trial counsel did not object to comments made by the prosecutor. In the following two instances, Appellant complains that the prosecutor omitted the *mens rea* requirement in his explanation:

We're only required to prove that the person died as a result of poisoning and the person who caused that result is the accused here.

We're required to prove solely that this man on a certain date in time did cause the death of the victim by means of arsenic.

Regarding the first comment, taken in the full context of the explanation, the prosecutor was explaining the "on or about" require-

ment of the indictment. We note that the prosecutor prefaced these remarks by stating:

What is required to prove it? You prove that a person did knowingly or intentionally cause the death of another individual by some means. That's what the State is required to prove.

The second remark was prefaced by the statement:

Of course, we're required to prove the elements beyond a reasonable doubt. Given the context within which these comments were made, we find that trial counsel was not deficient in failing to object.

During *voir dire*, the prosecutor made the following comment:

You might ask well, Mr. West, then if you're not required to have an eyewitness there, how can you do it? Are you required to have two or three witnesses, four or five? The law doesn't have any number of witnesses. Even if it was just one witness who could testify to the facts and circumstances of the case and if you believed those facts and circumstances from that one witness and you believed it beyond a reasonable doubt, you can convict upon that testimony alone. We call that the typical one eyewitness case or one witness case.

Do y'all understand that? Does anyone have a problem with that concept? If so, raise your hand.

So how might the State prove that the accused as charged in the indictment, poisoned the victim as we alleged? Remember these things. Common sense and all the surrounding facts and circumstances.... How does that apply to you as jurors? Very simple.

The law will allow you to look at all the facts and circumstances surrounding the offense that the State is allowed to bring in and see whether or not you can draw, as a reasonable conclusion, that the accused is the person who committed the offense.

Appellant asserts that these last two comments allowed the prosecutor to dilute the concept of beyond a reasonable doubt. Again, given the context of the comments in

explaining circumstantial evidence and the fact that they were prefaced by the comment concerning reasonable doubt, we find there was no compelling necessity for an objection.

During *voir dire*, the following exchange occurred:

STATE: ... There's another phrase that says, it is the kind of doubt that would make a reasonable person hesitate to act in the most important situations. What does that mean? It means you hesitate. First of all, folks, let's understand what it does mean. If you didn't carefully consider it, you may hesitate, but that's not reasonable doubt because reasonable doubt requires you to carefully consider it.

If you go back there, you may have some questions in your mind and you may be hesitant at that point in time as to whether the State proved its case, but it says after careful consideration and reasoning. That means that you talk with your fellow jurors. You decide and discuss these issues. You see, this is your careful consideration and reasoning. And then decide, do I believe that the State has proved its case to me? Based upon my reason and my careful consideration, do I feel that he didn't? Bottom line. Okay. There is nothing magical about that. After careful consideration, using my common sense, do I feel that he did it? It doesn't say, if I go back there and hesitate—

DEFENSE: Excuse me, Your Honor. I believe that's a misstatement of the law. The burden is always on the prosecution to convince the jury that they have proved their case.

COURT: Is that an objection, Counsel?

DEFENSE: Yes, it is.

COURT: What's your objection?

DEFENSE: I object to that as being a misstatement of the law of reasonable doubt that you have given the Court.

STATE: I'll clarify it for you.

COURT: Rephrase it.

STATE: What I'm doing is explaining a portion of the Court's charge. That's pretty long. And I don't want to go through reading line by line again and again. I'm just trying to explain it to you. So we're talking about beyond a reasonable doubt. Y'all understand that you'll get the definition for it; isn't that correct? You understand that one of the definitions in there requires you to use reason and common sense after careful and impartial consideration of the evidence. Do you understand that? That's all I'm asking.

COURT: Let me stop you right there. The big picture in this is—and I'm going back to something that he mentioned. And he's right. And it's okay to break that down and explain it. But the big picture is, this is not a question of did he do it. Okay? The issue is did the State prove it beyond a reasonable doubt. Do you see the difference? Okay?

Remember what I told you. You're not here to help anybody. It's for you to decide. You're here to perform an independent function. You're an independent body. You use those instructions to prove beyond a reasonable doubt. You make the determination based on those instructions and all of the other evidence brought to you and other instructions as to whether or not the State proved it beyond a reasonable doubt. That's your mission. That's your function. Is everyone clear on that? Okay?

Go ahead.

STATE: Obviously, in proving my case, we will submit to you the facts and circumstances to show, No. 1, he did it, and, No. 2, the facts and circumstances which we hope will convince you beyond a reasonable doubt that he is guilty as charged in the indictment. Do y'all understand that?

Appellant asserts this exchange warranted objection from trial counsel because it allowed a misstatement by indicating there is a "felt like he did it" standard regarding reasonable doubt. Further, Appellant contends that trial counsel was deficient in failing to secure a ruling upon his objection. We disagree. In reviewing the exchange as a whole, it is readily apparent that the prosecutor was initially trying to indicate that a juror's hesitance before considering the testimony was not the hesitance contemplated in the reasonable doubt definition. When he

utilized the loose "feel like he did it" language, trial counsel objected and obtained a corrective instruction from the court. We do not perceive that counsel was ineffective with regard to this exchange.

Appellant next maintains that trial counsel was ineffective in not offering an objection to the following statement by the prosecutor:

There's going to be conflicting testimony and the mere conflicts in testimony alone does not necessarily mean that you have a reasonable doubt. Why? Let me give—obviously, if mere conflict alone meant reasonable doubt, then in any criminal trial when the State brings up and says, you did, and the accused said, well, I didn't, then it would be all over. That's not how it works.

How it works is for you to decide what you're going to believe, resolve conflicts, if you can, back there with one another in discussing evidence, and see whether or not we have—the evidence brought to you has convinced you as to the guilt of the accused. Do we all understand that?

Appellant urges that the above statement placed an improper burden upon the jury to resolve conflicts in evidence before reaching its verdict. Given the phrase, "... if you can", we fail to perceive how this is the case.

■ In his final contention regarding *voir dire*, Appellant asserts that trial counsel was counterproductive in his own presentation to the jury panel. Trial counsel made the following statements to the jury panel:

Let's talk a little bit more about it. Proof beyond a reasonable doubt must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs. What does that mean, to act upon it without hesitation?

You know, I have one of the best examples that I've heard. I think most people would consider the act of getting married to someone as a very important event in someone's life. An important matter in a person's life. And I don't know how you were, but it's not uncommon for people right before the wedding to wonder. Am I making the right decision? Am I real (sic) marrying the person I should marry?

They may think about it and there may be a moment or even two where you wonder. Am I doing the right thing? You may hesitate to act. That moment of hesitation, that moment in (sic) the most important decision of your life, marriage, that, ladies and gentlemen, is reasonable doubt.

.    .    .    .    .

Look at a witness who testifies. Look at his motive in testifying. What does he have to gain or lose by testifying the way that he does? If he shows a bias that is brought out during the cross-examination of the testimony, take that into consideration. And if he's showing prejudice for one party or the other, take that into consideration when you start making your assessment. Again, you are the exclusive judge of the facts and the credibility of the witnesses.

With regard to trial counsel's explanation of reasonable doubt and the motive in testifying, Appellant maintains that given the facts of this case, such topics should have been avoided. Once again we disagree. Appellant testified that he and the victim were attempting a reconciliation and had agreed to start "fresh" with neither seeing anyone else. Furthermore, while appellate counsel disapproves of the tenure of this comment, this Court cannot discount the possibility that such comment was utilized as a strategic usage to emphasize hesitance in a marital situation. Regarding the second comment, part of the defensive posture at trial was that other individuals had an animus for the victim. Both parties presented numerous witnesses. Neither of counsel's admonitions amounted to ineffective assistance.

### 5. Presentation of Evidence and Failure to Object

■ Appellant asserts that trial counsel made numerous errors during the presentation of evidence. Initially, he contends that trial counsel was inept in his presentation of written evidence depicting the victim's feelings toward various members of her family. Specifically, these writings concerned her incestuous relationship with her brother.

These writings, Defense Exhibits Nos. Three and Four, were introduced during the cross-examination of her father. Appellant complains of the following excerpts from these writings:

> Bill violated me for several years ... no one told me it was evil. Susan joined in and did not tell Mom ... Dad said nothing when he discovered this evilness in the house. Bill was sent away. I was repaired and all was forgotten. Richard tried to help me. He tried to save me ... hangups about sex ... Bill does not like me because I achieved what he could not. Work was not fun and hurts my family life. When I don't have power, I feel inadequate. When I don't feel in control, I get angry ... fear of Bill and what his desires are—sex—sick sex—.

Appellant also questions the efficacy of trial counsel introducing Defense Exhibit No. Five, a letter outlining grievances and bad feelings the victim had for her father.

Appellant acknowledges that these writings were critical to the defensive theory that the victim either intentionally or inadvertently committed suicide. Appellant asserts, however, that Dillard diminished the impact of these writings during his cross-examination, some aspects of the writings were not believable and the State was able to rebut them. We note both Appellant's mental health experts relied upon these exhibits in forming their opinions. That these documents were challenged by the State does not detract from their validity in establishing Appellant's defensive strategy. We do not find trial counsel deficient in using these writings.

Appellant complains of numerous other acts and omissions of trial counsel. In particular, he asserts that trial counsel failed to object to portions of William Dillard, Sr.'s testimony that the victim was a strong, talented, and accomplished person.[13] Appellant contends that these character traits were inconsistent with the chosen defensive theory, accidental suicide. Part of psychiatric testimony explained that the victim's ability to function in the business world would not

demonstrate a lack of hangups, resentments, and anger in her personal life. We perceive a valid trial strategy.

Appellant complains that trial counsel did not object to Dillard's assertion that the victim did not want a divorce. However, this testimony came in from other sources and there was also evidence that both parties had vacillated on the subject.

During the direct examination of Dillard, the following exchange occurred:

> STATE: Without saying what she told you, did you have—after she talked to you, did you go to one of the doctors there at Presbyterian and express some concerns to the doctors?
>
> WITNESS: Yes, ma'am.
>
> STATE: And what did you—what was your concern at that time, Mr. Dillard?
>
> WITNESS: I was concerned that she might have been poisoned.

Appellant asserts that trial counsel should have objected to this "backdoor hearsay." See, Schaffer v. State, 777 S.W.2d 111, 113 (Tex.Crim.App.1989). While trial counsel might well have objected to this statement, we fail to see any harm, as suspicions of poisoning came in through numerous witnesses.

Appellant asserts that trial counsel was deficient in failing to object to the State's introduction of the victim's photograph after her death showing her fluid-bloated state at the hospital. The admissibility of such photographs is governed by Tex.R.Crim.Evid. 403. McFarland, 845 S.W.2d at 824, 841, cert. denied, — U.S. at —, 113 S.Ct. at 2937. There is no indication in the record that the court determined whether the probative value of the exhibit was substantially outweighed by the danger of unfair prejudice—the determination contemplated by Rule 403. Only one such photo was introduced, and it served the valid purpose of identifying the victim. Further, the photograph was demonstrative of testimony by Dr. Ali Bagheri that the victim's body was swollen due to the fluids administered to her.

---

13. By way of example, Appellant cites the testimony of the victim's father that Trammell Crow placed her in charge of a national highway beautification project.

We find that any objection to admission of the photograph would not have prevailed.

Appellant urges trial counsel's ineffectiveness in exploring the character of Bill Dillard, Jr., congenital defects in one of the victim's stillborn babies, and her father's purported indifference to the incest allegations. We find that these lines of inquiries served the purpose of furthering defensive trial theories that the victim's family refused to acknowledge the incest problem, and that Dillard was not aware of difficulties in his daughter's personal life.

Appellant next asserts ineffectiveness because trial counsel permitted testimony concerning an exchange between Dillard and Appellant at the hospital. Appellant complained about the doctor's failure to inquire whether the victim was allergic to any medication. Dillard responded that Appellant should tell the doctors about any allergies. Appellant asserts that trial counsel should have objected to this testimony as it caused the blame to be placed on him. Even if this is so, an isolated instance of failure to object will not render counsel ineffective. *Hathorn v. State*, 848 S.W.2d 101, 118 (Tex.Crim.App. 1992); *Bridge v. State*, 726 S.W.2d 558, 571 (Tex.Crim.App.1986); and *Moore v. State*, 700 S.W.2d 193, 205 (Tex.Crim.App.1985). Further, the second prong of *Strickland* requires that Appellant show that but for the deficiency of trial counsel, the result of the proceeding would have been different. No such showing is made here.

Appellant maintains that trial counsel was ineffective in his cross-examination of Dillard by inquiring into Dillard's assertion that Appellant had become materialistic. This cross-examination brought forth a number of responses from Dillard that Appellant was extravagant, purchased gifts for Tammy Ayn Gaisford, and was financially irresponsible. When Appellant took the stand, he gave testimony rebutting these assertions. We can readily perceive a plausible defensive strategy by showing Dillard's animus and bias toward Appellant.

Appellant's next contention involves trial counsel's cross-examination of Dillard regarding a trip Appellant took with his girlfriend. Dillard stated that he thought the Appellant met Guisford for a ski trip while ostensibly attending a therapy session. This exchange was logically tied into the next line of inquiry concerning the victim's action in moving $175,000 in community property into a separate bank account. Accordingly, it was acceptable trial strategy.

The Appellant asserts that trial counsel was deficient in allowing testimony from Dillard that Appellant did not know that his wife had changed the beneficiary of a $500,000 life insurance policy from himself to the couple's two daughters. This inquiry involved authentication of a letter from the victim to Appellant informing him of the change in beneficiaries. This letter, Defendant's Exhibit No. Fourteen, was later introduced into evidence.[14] As trial counsel possessed this letter, he could have very plausibly thought he had a definitive rebuttal to Dillard's assertions. Another assertion regarding this witness concerned Dillard's testimony that he did not think Bill, Jr. had a key to the victim's home. This was contrary to Appellant's testimony that Bill, Jr. and others had keys to the home. Again, isolated errors or omissions do not render counsel ineffective. *Hathorn v. State*, 848 S.W.2d at 118; *Bridge v. State*, 726 S.W.2d at 571; and *Moore v. State*, 700 S.W.2d at 205.

Appellant contends that trial counsel was ineffective with regard to his treatment of Mary Henrich, the victim's divorce attorney. Specifically, Appellant maintains that trial counsel was deficient in allowing Henrich's testimony concerning divorce negotiations in which Appellant's property disposition plan improperly treated the victim's separate property as community. Appellant contends this tended to bolster William Dillard's assertions that Appellant was materialistic. Trial counsel extensively cross-examined the witness concerning the complexities of divorce negotiations, however, and he took the oppor-

14. While it is true that the State rebutted the authenticity of this document and others through the testimony of Hartford Kittel, there is no indication that trial counsel was aware of this danger and he, in fact, stated during the hearing on the motion for new trial that he was surprised by the testimony.

tunity to illustrate the fairness of Appellant's subsequent proposals. During the defense case, trial counsel placed Richard Everts on the stand. Everts, a mediator, testified that Appellant stated to him that he wanted the divorce to be as "painless as possible and to avoid any injury to the children." We find a plausible trial strategy here.

Appellant also asserts that trial counsel erred in his handling of State's Exhibit No. Twelve, a letter from Nancy Lyon addressed to Appellant. Appellant contends this letter depicted Appellant as a "world-class heel" and "probably" generated sympathy for the victim. Trial counsel had the victim's divorce lawyer read this letter to the jury and then cross-examined her regarding the fact that the letter did not deal with any issues concerning the actual divorce. We cannot say that this was not plausible trial strategy.

Appellant contends that trial counsel allowed the State to utilize too much grand jury testimony in its direct examination. Appellant cites no authority in support of his point of error. Thus, nothing is presented for review. TEX.R.APP.P. 74(f); *see also Woods v. State*, 569 S.W.2d 901, 905 (Tex. Crim.App.1978), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3145, 69 L.Ed.2d 995 (1981); *Hicks v. State*, 545 S.W.2d 805 (Tex.Crim.App. 1977).

Appellant next faults trial counsel for attempting to impeach Stan Wetzel, Appellant's business partner, in the following manner:

DEFENSE: Is it fair to say, Mr. Wetzel, that there was (sic) some checks in there that Richard had used the company account for things that were—for furniture that was used at the business that is new at his house that you feel like you ought to be reimbursed for?
WITNESS: Yes.

We find this questioning was simply a restatement of something the witness stated earlier. Trial counsel was faced with the fact that Appellant wrote a company check to pay for arsenic, and may well have been trying to diffuse the impact of this evidence by showing Appellant had made other personal purchases on the company account. We find this to be plausible trial strategy.

Appellant complains that trial counsel's objection to Dr. Ali Bagheri's statement that, "The husband did not seem to be very concerned when I saw him in the emergency room" came too late. Trial counsel objected to this testimony as being speculative and the court directed the witness to testify only to what he saw. Trial counsel never obtained a ruling on the objection. Later, during the cross-examination of this witness, in response to counsel's questions, the witness stated that this behavior occurred after Appellant was informed that the victim was to be placed in intensive care.

During the subsequent testimony of other medical witnesses, trial counsel obtained testimony that rebutted Bagheri's testimony. We also note that trial counsel during cross-examination brought out that Appellant was with his daughter during this period, thus providing an explanation for Appellant's behavior. Even if error, we find this to be an isolated instance and harmless. See TEX. R.APP.P. 81(b).

Appellant also complains of trial counsel's cross-examination of Lynn Pease–Woods when he inquired if the victim's continual crying indicated suicidal tendencies. The witness answered that she asked the victim if she was contemplating suicide and she responded she was not. We find that it was sound trial strategy to embrace this subject as it showed the witness considered suicide a real possibility in this case.

Appellant maintains that there were numerous trial errors on the part of trial counsel in presenting the defense case. He first asserts that counsel erred in presenting the testimony of Norman Jack Amps, an Episcopal priest. Reverend Amps stated that:

I said, should you feel—conditional here— should you feel the need to seek some sort of female companionship and consolation, I don't think you should feel bad about it because I think it's very human. And, second, do not imagine that this is your next wife. Wait.

Appellant asserts this testimony was tasteless and shocking to the jury. However, trial counsel was faced with explaining Appellant's

trip to Mexico with Tammy Ayn Gaisford shortly after the victim's death. We will not second-guess trial counsel regarding an obvious strategic choice.

Appellant claims that trial counsel erred in presenting the testimony of Charles Couch. Appellant asserts that Couch was an antagonistic witness given his displeasure with the manner in which he was subpoenaed and that counsel failed to interview Couch before placing him on the stand. There is nothing in the record to indicate Couch's displeasure affected his trial testimony. Further, the record only indicates that trial counsel did not interview Couch prior to his being subpoenaed. There is nothing to indicate that trial counsel did not subsequently interview Couch. Appellant complains of damaging testimony from Couch during his cross-examination.[15] However, there is nothing to indicate that trial counsel knew there was a possibility of forgery at this point in the trial, and counsel did try to elicit a response that someone had illicitly sold chemicals without Couch's knowledge.

Next, Appellant contends that trial counsel was ineffective in failing to protect Appellant during his cross-examination. The Appellant complains of the following instance:

STATE: At what point, Mr. Lyon, did you come down and tell the police department in University Park, the Dallas Police Department, the District Attorney's Office— at what point did you come in and tell us about these suspects and all these people that had all this reason to kill your wife?

APPELLANT: At what time? There was—

STATE: Yes, sir.

APPELLANT: There was no time.

STATE: At what point did you call us and tell us that Nancy had arsenic and she had ordered this stuff and that you had papers to prove that?

APPELLANT: Ma'am, I was under arrest and indicted for murder. I mean, there was no conversation with your office or the police department at that time.

Appellant asserts that trial counsel allowed Appellant to appear guilty when he was under no obligation to talk to police or prosecutors. He also asserts that trial counsel allowed Appellant to respond to prosecutorial inquiries concerning other suspects mentioned as part of the trial defensive posture. However, we perceive valid trial strategy in not further accentuating Appellant's right not to divulge information to the authorities. Further, Appellant's exposure to questioning concerning the defensive posture was valid cross-examination and probably an inevitable result of placing Appellant on the stand.

Appellant asserts that trial counsel was deficient in failing to include in the record charts he used in summarizing the evidence, thereby waiving any error incurred pursuant to TEX.R.CRIM.EVID. 1006. These charts are not before this Court. Accordingly, we cannot analyze what harm, if any, accrued.

### 6. Closing Argument

■ Appellant urges three instances of ineffectiveness of counsel where trial counsel failed to object to the prosecutor's argument during closing arguments at the guilt-innocence stage of trial.

During closing argument, the prosecutor made the following argument:

I—typically, in every case I've ever tried, I believe, on a murder, I've had to set the family of the victim down before I got in here and tell them what was about to happen.

Although this comment is outside the record, we perceive a plausible strategic purpose in not objecting to it. Allowing the jury to hear that the victim's family sat down with the prosecutor prior to trial so they might anticipate certain events and, perhaps testify accordingly, might serve Appellant's cause. See generally TEX.CODE CRIM.PROC.ANN. art. 56.02 (Vernon Supp.1994).

■ The prosecutor also made the following argument:

All this about having barium in her system. Folks, way on back Nancy was suspicious of those pills and gave them to the

---

15. Couch testified he thought Defense Exhibit No. 97 was a forgery and also related that he heard the woman who came to pick up the ant poison formula was a blonde.

nanny. Barium doesn't sit in your system and in your blood forever. It ought to be just more logical to you that there wasn't abnormal amounts of barium in her blood when she died. She wasn't taking the pills anymore. She took some of them. They make her sick. She gave them to the nanny. She wasn't taking them anymore.

Appellant contends that the above comment was not supported by the record. However, we find that such comment to be a reasonable deduction from the evidence. *See Alejandro v. State,* 493 S.W.2d 230, 231 (Tex. Crim.App.1973). The prosecutor was attempting to explain why the victim became suspicious of the pills and gave them to the nanny.

 The prosecutor also argued:

I'm not going to tell you that I know that it's hers or it's not or it's his or it's not. The law provides that handwriting—that if jurors—you don't have to have an expert. You can look at it. And I'm going to challenge you. If you don't do anything else, you go back in that jury room. And you take the evidence that's been admitted in front of you that were known writings. And you make sure, the ones that are known, that you take Richard Lyon's writings.

He sat up here—and I have a stack of them for this very purpose—and said, yes, those are my writings. And you look at me. And you tell me, if one of the first things that doesn't jump at you, besides these S's that Mr. Kittel told you about. You see this backward staff right here on this F. You go back and you find it in anything that Nancy Lyon wrote. And you look at everything that this man has written. If you don't find that, I'll will (sic) shave my head when this trial is over.

It is ordinarily improper for a prosecutor to vouch for the credibility of a witness during argument. *Chapman v. State,* 503 S.W.2d 237, 238 (Tex.Crim.App.1974). However, we find that the comment fails to rise to the level of directly vouching for the credibility of a witness. It appears more to be an exhortation for the jury to examine the evidence for themselves and then agree with the prosecutor's assertions. If error, we fail to

see that this harmed Appellant. See TEX. R.APP.P. 81(b).

We have carefully examined the record as a whole and find that trial counsel presented an extensive, complete defense. Thus, we conclude that Appellant has failed to meet his burden of demonstrating that trial counsel did not provide reasonably effective assistance of counsel, and we overrule Points of Error Nos. Three and Four.

Accordingly, we affirm the judgment of the trial court.

OSBORN, C.J., not participating.