**Johnny Ray ROBERTSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 08–00–00147–CR.**

Court of Appeals of Texas,
El Paso.

Jan. 30, 2003.

David K. Haynes, McKinney, for appellant.

Tom O'Connell, Criminal District Attorney, McKinney, for appellee.

Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

## OPINION

DAVID WELLINGTON CHEW, Justice.

Appellant Johnny Ray Robertson was convicted of manslaughter and sentenced to 15 years in prison by the jury. On appeal, Appellant brings a single issue: the evidence was insufficient to establish he recklessly caused the victim's death. We affirm.

On January 7, 1999, Appellant had a grand mal seizure while driving along a state highway in McKinney, Texas. His car drifted off the highway, narrowly missing a number of structures before it crashed into the living room of a house. Nine-year-old Katherine Chandler, home sick from school, was resting in the living room and was crushed to death between the car and an interior wall of the house.

Five months later, Appellant was indicted in Collin County. The indictment provided that:

Johnny Ray Robertson ... on or about the 7th day of January in the year ... 1999 ... did then and there

recklessly cause the death of an individual, Katherine Chandler, by defendant driving and operating a motor vehicle contrary to medical instructions, and the defendant did collide into a habitation occupied by Katherine Chandler;

. . .

recklessly cause the death of an individual, Katherine Chandler, by defendant driving and operating a motor vehicle and failed to follow medical aftercare instructions, and the defendant did collide into a habitation occupied by Katherine Chandler;

. . .

recklessly cause the death of an individual, Katherine Chandler, by defendant driving and operating a motor vehicle and defendant failed to take seizure medication prescribed for the defendant, and the defendant did collide into a habitation occupied by Katherine Chandler;

. . .

recklessly cause the death of an individual, Katherine Chandler, by defendant driving and operating a motor vehicle while aware of defendant's risk of seizure and the defendant disregarded said risk and did collide into a habitation occupied by Katherine Chandler;

. . .

recklessly cause the death of an individual, Katherine Chandler, by defendant driving and operating a motor vehicle and defendant was aware of defendant's history of seizures, and the defendant did collide into a habitation occupied by Katherine Chandler;

. . .

recklessly cause the death of an individual, Katherine Chandler, by defendant having a seizure while driving and operating a motor vehicle and did collide into a habitation occupied by Katherine Chandler;

. . .

recklessly cause serious bodily injury to Katherine Chandler by striking Katherine Chandler with a motor vehicle. . . .

After a three-day trial, the jury deliberated for forty-four minutes before finding Appellant guilty of manslaughter.

## Facts at Trial

The testimony at trial presented tragic, largely undisputed facts. In 1989, Appellant suffered a severe head injury in a motorcycle accident. He was impaired physically and mentally. Appellant's condition gradually improved to the point where he was able to function on his own, "more or less." Appellant's mother testified that he is able to live in his own apartment, cook, and drive on his own, and able to hold down a job doing grounds maintenance and air-conditioning/heating work. She also stated that Appellant goes to the doctors and takes medication by himself. Appellant's friend, Joyce Cox, testified to the same.

Although, as witnesses testified, Appellant is able to take care of himself and drives himself around, he is subject to seizures that incapacitate him. In 1991, Appellant had a seizure while driving his mother's car and wrecked it driving it into a creek in Plano, Texas. Key to this case, on October 11, 1998, about three months before the fatal accident, Appellant suffered a seizure and was admitted to the Columbia Medical Center in Plano, Texas. At the hospital, Dr. James Touchy diagnosed that Appellant had "breakthrough seizures" and prescribed "Dilantin 100 mg t.i.d." to control the seizures. Dr. Touchy testified that he prescribed to Appellant a therapeutic level of Dilantin and gave him orders not to drive until approved by a neurologist, Dr. Hurd. Dr. Touchy further explained that a person prone to seizures cannot safely drive an automobile without a therapeutic level of Dilantin because they could possibly have a seizure while driving.

Laura Jones, R.N., with the Columbia Medical Center, gave Appellant aftercare instructions, and Appellant and his mother signed and verbalized their understanding of the instructions and were given a written copy. The instructions informed Appellant that he must take an increased dosage of the Dilantin three times per day, must not cease medication without consulting a physician, and must not operate dangerous equipment or drive automobiles unless approved by Dr. Hurd, the

neurologist. Appellant filled the prescription that same day, but he never consulted Dr. Hurd.

In October of 1998, Appellant, who was at that time in a rehabilitation hospital, consulted Dr. John Wilson about urinary problems. Dr. Wilson was aware that Appellant had a history of seizures and that he had been involved in an oil well accident, as well as two traffic accidents that resulted in trauma to the head. Dr. Wilson considered Appellant not a clear-thinking individual, but nevertheless he was aware of his seizures and concerned about his medical problems. However, Dr. Wilson stated that he also questioned Appellant's ability to understand directions and that Appellant always consulted his mother.

Appellant informed Dr. Wilson that he had a seizure on October 11, 1998, and that he was taking Dilantin to treat it. Dr. Wilson did not remove Appellant from the medication, nor did he authorize Appellant to drive. On January 14, 1999, Appellant reported to Dr. Wilson's office staff that he had been on Dilantin but stopped taking it, and Dr. Wilson gave orders for him to continue on the medication.

Dr. John Pickens, a urologist, treated Appellant for blockage of the urethra. Appellant needed surgery, which was performed in November 1998. Dr. Pickens testified that he ranked Appellant's ability to give accurate and detailed medical history as "middle of the road." There were signs that Appellant had a past head injury, due to the fact that he was not "real crisp on responses to questions" and had slight delay in his answers. Dr. Pickens stated, however, that Appellant was able to discuss his medical problems, understand the procedures and the risks, and was aware of his actions in agreeing to the surgery. Prior to the surgery, Appellant was able to provide accurate medical history, including current medication, past history, and allergies. He participated in pre-operation consultations and signed papers for the surgery, including an informed consent form for patients. Dr. Pickens never met Appellant's mother during the four months of treatment and never took him off Dilantin or seizure medication.

Appellant applied for a driver's license on December 7, 1998, and had to take a written and vehicular driving test. Answering medical questions is a part of the test. Some of the questions asked are as follows:

(1) Whether the applicant has had an epileptic seizure or loss of consciousness in the last year;

(2) whether he had been hospitalized in the last year for dizziness or high blood pressure; and

(3) if within the past two years he was treated for any serious medical condition.

If any of the these questions are answered affirmatively, then the applicant is referred to a Medical Advisory Board. Appellant has never been referred to an Advisory Board. While the answers to the three questions are confidential, the referral is not and would be noted in his driver's license file.

After Appellant's vehicle crashed into the house, Appellant was seen in the driver's seat twitching as his head and right arm moved back and forth. He was not responsive. The first paramedic on the scene testified that Appellant was postictal (or had just suffered a seizure), although he had no apparent injuries.

Paramedics Lillian Novatzyk and Cary Elder further examined and treated Appellant. Appellant informed Novatzyk that he had felt a seizure coming on just before the accident. Appellant also elabo-

rated that he had a history of seizures, was not taking any medication, and was allergic to the drug Haldol. Appellant said he stopped taking medication because he had stopped having seizures. Novatzyk thought Appellant was a good informant on his medical history in that he was coherent on his past medical history, medication, dates he stopped taking medication, and his allergies. Indeed, when Chemist Cheryl Payton of the DPS laboratory analyzed Appellant's blood, which was drawn by a nurse at the admitting hospital, she detected no seizure medication, including Dilantin/Phenytoin.

Dr. Wiederman attended Appellant at the hospital after the accident and confirmed that Appellant had a seizure. Appellant also told Dr. Wiederman that he had a seizure. Appellant also described a previous incident in which he had a seizure while driving and ran off the road. Dr. Wiederman stated that seizure patients are aware of the prohibition on their driving because of the danger posed. Dr. Wiederman had no problems communicating with Appellant and Appellant was able to express himself to the medical staff. Dr. Wiederman did not recall consulting Appellant's mother about his condition. She stated that he appeared independent of his mother, but that he asked for his mother even though he was thirty-seven years old. She has observed that seizure patients could be more dependent on others and may seek out their mothers, if the patient was oriented toward her and if she was a significant person in daily life. She also stated that Appellant appeared to be a little slow, outside of the postictal sense, and had little or no response when told he had struck and killed someone.

Nurse Lucy Ann Sanderson also attended Appellant and stated that he was able to describe the accident to her and also gave his medical history. He was very specific in relating his medical history, detailing his seizure problem, urinary problem, and the operation he had the previous month for the urinary problem. He also asked the nurse to call his mother because he was concerned about his girlfriend being picked up at the bus station. Sanderson stated that Appellant was responsive to her questions, appeared alert and oriented, and was a good informant of his medical history.

At the hospital, Appellant was able to converse with his mother on the telephone and told her that he had "blacked out" and might have injured a child. Furthermore, while leaving the hospital with his father, he told his father that he had "another spell and that he blacked out and hit a child."

Appellant called the McKinney Police Department in order to retrieve the articles from his wrecked vehicle, including his driver's license, after the fatal accident. The dispatcher that Appellant had spoken to stated that Appellant appeared to understand the information she provided and did not appear confused in any way.

A news reporter, Jacque Hillburn, interviewed Appellant about the accident, his medical condition, and the medication. Appellant described to the reporter his medical history as consisting of seizures and a head injury. He admitted that he had a seizure on the day of the accident and had not taken medication that day.

Paul Cogwell, an investigator with the McKinney Police Department, interviewed Appellant after the accident and Appellant stated that he had a seizure, lost control of the vehicle, and rammed a house. Cogwell also overheard Appellant telling the paramedics repeatedly that he had a seizure. Appellant revealed that he had felt similar symptoms earlier on the day of the accident while on his way to Bridgeport and was just trying to return to Plano. He

admitted he had not taken medication for the seizure in a couple of weeks and that he had a car accident previously, where he had a seizure and ran off the road.

## Facts in the Record

What has been detailed above is what the jury heard at trial. Close scrutiny of the record, specifically, the voluminous medical records of Appellant that were offered and introduced by the State provides notable, albeit obscured, facts chronology that significantly undermines the factual basis of the State's theory that Appellant consciously disregarded medical instructions and directives.

We begin with the testimony of Dr. Wilson. In his testimony, he alluded to the fact that Appellant had been hospitalized in October 1998 in a rehabilitation hospital—Charter Hospital; however, he was unable to say when or how long Appellant was hospitalized. In the nursing notes from the Garland Community Hospital dated November 3, 1998, is commentary that strongly suggests that Appellant was admitted into Charter Hospital on October 12, 1998. The same record also indicates that he was discharged on the 25th of that month. In Dr. Wilson's progress notes of the first office visit with Appellant on October 22, 1998 is the statement: "patient seen post hospital follow-up from Charter Hospital ... he was previously on Dilantin however *Dilantin was removed.*" [Emphasis added]. We also note that State's Exhibit 6 shows that Appellant filled Dr. Touchy's prescription for Dilantin on October 11, 1998 and received 100 pills.

Dr. Wilson also stated in his History and Physical Examination report, made when Appellant was admitted to Garland Community Hospital on November 3, 1998, that "[Appellant] comes in on medications of Valium, BuSpar, Klonopin and *Dilantin that was stopped in 1991.*" [Emphasis

added]. On January 14, 1998, Appellant had an office visit with Dr. Wilson and the doctor's staff completed a Medication Record that reported: "Dilantin 100 mg TID DISCONT." The same form records three previous visits, October 22, 1998, December 8, 1998, and December 22, 1998, but Dilantin is not listed on any of those dates, and on the first visit, there is the notation: "Charter has medication."

The State also introduced the medical records for his treatment on March 4, 1991, after Appellant had a seizure while driving his mother's car and drove off the road into a creek. Of significance, these medical records noted that Appellant had stated that he had stopped taking Dilantin the week before the accident because he "had stopped having seizures." On a Patient Admission Assessment form completed on November 3, 1998, at Garland Community Hospital, in the medications section, it too stated that Appellant reported that he had stopped taking Dilantin and Klonopin in 1991. Additionally, the Nursing Chart taken on January 7, 1999, at Colombia Medical Center in McKinney, where Appellant was taken following the accident, states that Appellant reported past seizures and that he stopped "taking Dilantin & Clonadine in 1990."

Finally, while the testimony at trial provides anecdotal examples that he was a man who could function "more or less" on his own, a composite of his medical condition can be found in the medical records. These records establish that Appellant suffered two severe brain trauma accidents resulting in skull depression fractures, loss of skull bone and insertion of a metal plate, atrophy at the temporal lobes of the brain, and a classification as low grade mentality. He has a speech deficit, a cognitive deficit, a wide-spaced gait, and suf-

fers from both post-seizure syndrome and post-head trauma syndrome.

## Standard of Review

Appellant complains of the sufficiency of the evidence to find the culpable mental state alleged in the indictment. He prays only for a reversal and acquittal of his conviction, accordingly we must treat his issue as a challenge to the legal sufficiency of the evidence.

 The standard of review is well established. We must examine all of the evidence in a light most favorable to the verdict in order to determine whether any rational trier of fact could find the essential elements of the crime as alleged beyond a reasonable doubt. *See Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App. 1999); *Lyon v. State*, 885 S.W.2d 506, 516 (Tex.App.-El Paso 1994, pet. ref'd). Our duty is not to reexamine the evidence and impose our own judgment as to whether the evidence establishes guilt beyond a reasonable doubt, but only to determine if the findings by the trier of fact are rational. *See Lyon*, 885 S.W.2d at 516–17. Any inconsistencies in the evidence are resolved in favor of the verdict. *See Matson v. State*, 819 S.W.2d 839, 843 (Tex.Crim. App.1991). This standard of review applies equally to both direct and circumstantial evidence cases. *See Geesa v. State*, 820 S.W.2d 154, 161 (Tex.Crim.App. 1991); *Garcia v. State*, 871 S.W.2d 279, 280 (Tex.App.-El Paso 1994, no pet.).

 A manslaughter conviction requires proof that appellant acted "recklessly" and "cause[d] the death of an individual." *See* TEX.PEN.CODE ANN. § 19.04(a)(Vernon 1994). A person acts recklessly when he is aware of but consciously disregards a sub-stantial and unjustifiable risk that the circumstances exist of the result will occur. TEX.PEN.CODE ANN. § 6.03(c)(Vernon 1994). Generally, culpable mental conduct is proven through circumstantial evidence. *See Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim.App.1978). It is inferred from the acts, words, and conduct of the accused and the surrounding circumstances. *See Ledesma v. State*, 677 S.W.2d 529, 531 (Tex.Crim.App.1984).

## Discussion

 The gravamen then is whether a rational fact finder could have found Appellant demonstrated a realization of the imminence of danger and a conscious and unjustifiable disregard of the danger when he decided to drive his car prior to the fatal accident. The indicia of recklessness presented in this appeal are essentially three separate acts: (1) failing to take prescribed anti-epileptic medicine; (2) driving contrary to medical instructions against driving; and (3) driving knowing of his propensity to have seizures.[1]

It is undisputed that Appellant is prone to seizures. He was prescribed Dilantin for his seizures in 1989 and he stopped taking it in 1991. On October 11, 1998, he suffered a seizure and was given a prescription for Dilantin and instructions not to drive until okayed by a neurologist. That same day he filled the prescription, which provided enough pills to last three months. What was not brought out in the trial or even on appeal, was that Appellant was admitted to what appears to be a drug and alcohol rehabilitation hospital, Charter Hospital, on the very next day—October 12, 1998. This date is established by a single, obscure entry on the Patient Ad-

---

1. The State also argues that simply having the seizure amounts to an act of recklessness. We disagree. "An epileptic seizure while driving and an ensuing fatal accident is an example law school textbooks use to distin-guish cases in which there is no criminal culpability from those in which there is criminal responsibility." *See Commonwealth of Pennsylvania v. Cheatham*, 419 Pa.Super. 603, 615 A.2d 802, 806 (1992).

mission Assessment taken at Garland Community Hospital on November 3, 1998. That same form suggests that he was discharged on October 25; however, Dr. Wilson's notation of a "follow up post hospital" office visit on October 22 suggests an early date. Regrettably, the medical records from Charter Hospital were not introduced at trial.

As important as the date of admission is another fact recorded by the Garland Community Hospital. Appellant had been taking Valium and two other drugs at Charter Hospital and he had his last dose on October 25.

Consequently, following the October 11 seizure, Appellant was in the Charter Hospital from October 12 to about the 22nd or 25th of that month. He was then admitted to Garland Community Hospital on November 3 and was hospitalized for four days. Between November 7, 1998, the day he was discharged from the Garland hospital, until the day of the fatal accident, Appellant had at least eight medical office visits.

Shortly after the accident, Appellant told one paramedic that he was on seizure medicine, but "had been out of it for a couple of weeks." Yet, the record shows that he filled the Dilantin prescription on October 11 for 100 pills, more than a three-month supply. Then, only moments later, he reportedly told another paramedic that he had taken himself off the seizure medicine because he had not had a seizure. Interestingly, that was the same reason he had given to emergency room nurses at the time of the 1991 accident.

At trial, Dr. Wilson's testimony provided a strong inference that Appellant on his own had discontinued taking the Dilantin that Dr. Touchy had prescribed. However, Appellant's admission to Charter Hospital the day after filling Dr. Touchy's prescription belies that inference. In the Progress Note dated October 22, 1998, Dr.

Wilson stated: "[Appellant] was previously on Dilantin however the Dilantin was *removed*." [Emphasis added]. While we do not have the favor of the Charter Hospital records, we do note from the Physician's Desk Reference that "drugs which may increase phenytoin serum levels [Dilantin] include ... diazepam [Valium]...." *PDR*, 57th Ed. 2531, 2533 (2003). Consequently, a strong inference can be drawn that when Appellant was admitted to Charter Hospital for his alcoholism, he was removed from Dilantin and prescribed Valium, which is also an anti-epileptic drug. *Id.* at 2964. Moreover, the medical records entries from October 23, 1998 through January 14, 1999, a week after the accident, all show that Appellant's general compliant was with his numerous prescriptions. All of the medical records subsequent to Appellant's October 11, 1998 seizure are post-Charter Hospital and nowhere indicate that Appellant had a current prescription for Dilantin until January 14, 1999.

### Failing to take Prescribed Anti-epileptic Medicine

Consequently, viewing all of the evidence, but in the light most favorable to the jury's verdict, we conclude that there is simply no evidence that Appellant's discontinuation of the anti-epileptic medicine prescribed by Dr. Touchy was done in conscious disregard of a substantial and justifiable risk. Rather, it seems apparent that in the intervening weeks between October 11, 1998 and January 7, 1999, a number of medical hands simply overlooked or ignored Appellant's history of seizures and Dr. Touchy's prescription.

### Driving contrary to Medical Instructions; and Driving Knowing of his Propensity to have Seizures

While Appellant's mental ability to appreciate appropriately the medical instructions not to drive until okayed by a neurologist are debatable, particularly given the

host of intervening medical treatments and his cognitive abilities, there are, unfortunately, no psychological mental assessments or findings that grace this record. Yet, there is a distinct feeling gained that Appellant's mental processing is analogous to the accounting term, LIFO—Last In First Out, that is, Appellant's general compliance with the last set of medical instructions given. However, it is abundantly clear from the record that Appellant should not have been driving. He has a history of past automobile accidents caused by his susceptibility to seizures. Especially critical is inferential evidence that he avoided or misrepresented his medical condition on his driver's license renewal application, evidence which tends to show conscious disregard of the danger to other motorists and the public because he knew that he could lose physical control over his body. Further, his decision to drive on January 7, 1999 was a conscious choice in disregard of the unjustifiable danger his driving posed. Appellant's single issue is overruled.

The judgment of the trial court is affirmed.