COURT OF
APPEALS

                                                    EIGHTH DISTRICT
OF TEXAS

                                                               EL
PASO, TEXAS

 

JOHNNY RAY ROBERTSON,                           )

                                                                              )               No.  08-00-00147-CR

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )               
219th District Court

THE STATE OF TEXAS,                                     )

                                                                              )            
of Collin County, Texas

Appellee.                           )

                                                                              )              
(TC# 219-80592-99)

                                                                              )

 

 

O
P I N I O N

 

Appellant Johnny
Ray Robertson was convicted of manslaughter and sentenced to 15 years in prison
by the jury.  On appeal, Appellant brings
a single issue:  the evidence was insufficient
to establish he recklessly caused the victim=s
death.  We affirm.

On January 7,
1999, Appellant had a grand mal seizure while driving along a state highway in
McKinney, Texas.  His car drifted off the
highway, narrowly missing a number of structures before it crashed into the
living room of a house.  Nine-year-old
Katherine Chandler, home sick from school, was resting in the living room and
was crushed to death between the car and an interior wall of the house. 

Five months later,
Appellant was indicted in Collin County. 
The indictment provided that:








Johnny Ray Robertson . . . on or about
the 7th day of January in the year . . . 1999 . . . did then and there

 

recklessly
cause the death of an individual, Katherine Chandler, by defendant driving and
operating a motor vehicle contrary to medical instructions, and the defendant
did collide into a habitation occupied by Katherine Chandler; 

 

.               .               .

 

recklessly
cause the death of an individual, Katherine Chandler, by defendant driving and
operating a motor vehicle and failed to follow medical aftercare instructions,
and the defendant did collide into a habitation occupied by Katherine Chandler;


 

.               .               .

 

recklessly cause the death of an
individual, Katherine Chandler, by defendant driving and operating a motor
vehicle and defendant failed to take seizure medication prescribed for the
defendant, and the defendant did collide into a habitation occupied by Katherine
Chandler; 

 

.               .               .

 

recklessly cause the death of an
individual, Katherine Chandler, by defendant driving and operating a motor
vehicle while aware of defendant=s
risk of seizure and the defendant disregarded said risk and did collide into a
habitation occupied by Katherine Chandler; 

 

.               .               .

 

recklessly
cause the death of an individual, Katherine Chandler, by defendant driving and
operating a motor vehicle and defendant was aware of defendant=s history of seizures, and the
defendant did collide into a habitation occupied by Katherine Chandler; 

 

.               .               .

 

recklessly
cause the death of an individual, Katherine Chandler, by defendant having a
seizure while driving and operating a motor vehicle and did collide into a
habitation occupied by Katherine Chandler;

 

.               .               .

 








recklessly
cause serious bodily injury to Katherine Chandler by striking Katherine
Chandler with a motor vehicle . . . .

 

After a three-day
trial, the jury deliberated for forty-four minutes before finding Appellant
guilty of manslaughter. 

                                                                   Facts
at Trial

The testimony at
trial presented tragic, largely undisputed facts.  In 1989, Appellant suffered a severe head
injury in a motorcycle accident.  He was
impaired physically and mentally. 
Appellant=s
condition gradually improved to the point where he was able to function on his
own, Amore or
less.@  Appellant=s
mother testified that he is able to live in his own apartment, cook, and drive
on his own, and able to hold down a job doing grounds maintenance and 

air-conditioning/heating
work.  She also stated that Appellant
goes to the doctors and takes medication by himself.  Appellant=s
friend, Joyce Cox, testified to the same.  









Although, as
witnesses testified, Appellant is able to take care of himself and drives
himself around, he is subject to seizures that incapacitate him.  In 1991, Appellant had a seizure while
driving his mother=s car and
wrecked it driving it into a creek in Plano, Texas.  Key to this case, on October 11, 1998, about
three months before the fatal accident, Appellant suffered a seizure and was
admitted to the Columbia Medical Center in Plano, Texas.  At the hospital, Dr. James Touchy
diagnosed that Appellant had Abreakthrough
seizures@ and
prescribed ADilantin 100 mg t.i.d.@ to control the seizures.  Dr. Touchy testified that he prescribed to
Appellant a therapeutic level of Dilantin and gave
him orders not to drive until approved by a neurologist, Dr. Hurd.  Dr. Touchy
further explained that a person prone to seizures cannot safely drive an
automobile without a therapeutic level of Dilantin
because they could possibly have a seizure while driving.

Laura Jones, R.N.,
with the Columbia Medical Center, gave Appellant aftercare instructions, and
Appellant and his mother signed and verbalized their understanding of the
instructions and were given a written copy. 
The instructions informed Appellant that he must take an increased
dosage of the Dilantin three times per day, must not
cease medication without consulting a physician, and must not operate dangerous
equipment or drive automobiles unless approved by Dr. Hurd,
the neurologist.  Appellant filled the
prescription that same day, but he never consulted Dr. Hurd.

In October of
1998, Appellant, who was at that time in a rehabilitation hospital, consulted
Dr. John Wilson about urinary problems. 
Dr. Wilson was aware that Appellant had a history of seizures and that
he had been involved in an oil well accident, as well as two traffic accidents
that resulted in trauma to the head.  Dr.
Wilson considered Appellant not a 

clear-thinking
individual, but nevertheless he was aware of his seizures and concerned about
his medical problems.  However, Dr.
Wilson stated that he also questioned Appellant=s
ability to understand directions and that Appellant always consulted his
mother.   

Appellant informed
Dr. Wilson that he had a seizure on October 11, 1998, and that he was taking Dilantin to treat it. 
Dr. Wilson did not remove Appellant from the medication, nor did he
authorize Appellant to drive.  On January
14, 1999, Appellant reported to Dr. Wilson=s
office staff that he had been on Dilantin but stopped
taking it, and Dr. Wilson gave orders for him to
continue on the medication.








Dr. John Pickens, a urologist, treated Appellant for blockage of the
urethra.  Appellant needed surgery, which
was performed in November 1998.  Dr.
Pickens testified that he ranked Appellant=s
ability to give accurate and detailed medical history as Amiddle of the road.@ 
There were signs that Appellant had a past head injury, due to the fact
that he was not Areal
crisp on responses to questions@
and had slight delay in his answers.  Dr.
Pickens stated, however, that Appellant was able to discuss his medical
problems, understand the procedures and the risks, and was aware of his actions
in agreeing to the surgery.  Prior to the
surgery, Appellant was able to provide accurate medical history, including
current medication, past history, and allergies.  He participated in pre-operation
consultations and signed papers for the surgery, including an informed consent
form for patients.  Dr. Pickens never met
Appellant=s mother
during the four months of treatment and never took him off Dilantin
or seizure medication.   

Appellant applied
for a driver=s license
on December 7, 1998, and had to take a written and vehicular driving test.  Answering medical questions is a part of the
test.  Some of the questions asked are as
follows:

(1)        Whether the applicant has had an
epileptic seizure or loss of consciousness in the last year;

 

(2)        whether he had
been hospitalized in the last year for dizziness or high blood pressure; and 

 

(3)        if within the
past two years he was treated for any serious medical condition.

 

If any of the
these questions are answered affirmatively, then the applicant is
referred to a Medical Advisory Board. 
Appellant has never been referred to an Advisory Board.  While the answers to the three questions are
confidential, the referral is not and would be noted in his driver=s license file.








After Appellant=s vehicle crashed into the house,
Appellant was seen in the driver=s
seat twitching as his head and right arm moved back and forth.  He was not responsive.  The first paramedic on the scene testified
that Appellant was postictal (or had just suffered a
seizure), although he had no apparent injuries.

Paramedics Lillian
Novatzyk and Cary Elder further examined and treated
Appellant.  Appellant informed Novatzyk that he had felt a seizure coming on just before
the accident.  Appellant also elaborated
that he had a history of seizures, was not taking any medication, and was
allergic to the drug Haldol.  Appellant said he stopped taking medication
because he had stopped having seizures.  Novatzyk thought Appellant was a good informant on his
medical history in that he was coherent on his past medical history,
medication, dates he stopped taking medication, and his allergies.  Indeed, when Chemist Cheryl Payton of the DPS
laboratory analyzed Appellant=s
blood, which was drawn by a nurse at the admitting hospital, she detected no
seizure medication, including Dilantin/Phenytoin.   








Dr. Wiederman attended Appellant at the hospital after the
accident and confirmed that Appellant had a seizure.  Appellant also told Dr. Wiederman
that he had a seizure.  Appellant also
described a previous incident in which he had a seizure while driving and ran
off the road.  Dr. Wiederman
stated that seizure patients are aware of the prohibition on their driving
because of the danger posed.  Dr. Wiederman had no problems communicating with Appellant and
Appellant was able to express himself to the medical
staff.  Dr. Wiederman
did not recall consulting Appellant=s
mother about his condition.  She stated
that he appeared independent of his mother, but that he asked for his mother
even though he was thirty-seven years old. 
She has 
observed that seizure patients could be more dependent on others
and may seek out their mothers, if the patient was oriented toward her and if
she was a significant person in daily life. 
She also stated that Appellant appeared to be a little slow, outside of
the postictal sense, and had little or no response
when told he had struck and killed someone.  


Nurse Lucy Ann
Sanderson also attended Appellant and stated that he was able to describe the
accident to her and also gave his medical history.  He was very specific in relating his medical
history, detailing his seizure problem, urinary problem, and the operation he
had the previous month for the urinary problem. 
He also asked the nurse to call his mother because he was concerned
about his girlfriend being picked up at the bus station.  Sanderson stated that Appellant was
responsive to her questions, appeared alert and oriented, and was a good
informant of his medical history.

At the hospital,
Appellant was able to converse with his mother on the telephone and told her
that he had Ablacked
out@ and might have injured a child.  Furthermore, while leaving the hospital with
his father, he told his father that he had Aanother
spell and that he blacked out and hit a child.@

Appellant called
the McKinney Police Department in order to retrieve the articles from his
wrecked vehicle, including his driver=s
license, after the fatal accident.  The
dispatcher that Appellant had spoken to stated that Appellant appeared to
understand the information she provided and did not appear confused in any way.

A news reporter,
Jacque Hillburn, interviewed Appellant about the
accident, his medical condition, and the medication.  Appellant described to the reporter his
medical history as consisting of seizures and a head injury.  He admitted that he had a seizure on the day
of the accident and had not taken medication that day.   








Paul Cogwell, an investigator with the McKinney Police
Department, interviewed Appellant after the accident and Appellant stated that
he had a seizure, lost control of the vehicle, and rammed a house.  Cogwell also
overheard Appellant telling the paramedics repeatedly that he had a seizure.  Appellant revealed that he had felt similar
symptoms earlier on the day of the accident while on his way to Bridgeport and
was just trying to return to Plano.  He
admitted he had not taken medication for the seizure in a couple of weeks and
that he had a car accident previously, where he had a seizure and ran off the
road.  

Facts in the Record

What has been
detailed above is what the jury heard at trial. 
Close scrutiny of the record, specifically, the voluminous medical
records of Appellant that were offered and introduced by the State provides
notable, albeit obscured, facts chronology that significantly undermines the
factual basis of the State=s
theory that Appellant consciously disregarded medical instructions and
directives. 








We begin with the
testimony of Dr. Wilson.  In his
testimony, he alluded to the fact that Appellant had been hospitalized in
October 1998 in a rehabilitation hospital--Charter Hospital; however, he was
unable to say when or how long Appellant was hospitalized.  In the nursing notes from the Garland
Community Hospital dated November 3, 1998, is commentary that strongly suggests
that Appellant was admitted into Charter Hospital on October 12, 1998.  The same record also indicates that he was
discharged on the 25th of that month.  In
Dr. Wilson=s
progress notes of the first office visit with Appellant on October 22, 1998 is
the statement: Apatient
seen post hospital follow-up from Charter Hospital . . . he was previously on Dilantin however Dilantin
was removed.@  [Emphasis added].  We also note that State=s Exhibit 6 shows that Appellant filled
Dr. Touchy=s
prescription for Dilantin on October 11, 1998 and
received 100 pills. 

Dr. Wilson also
stated in his History and Physical Examination report, made when Appellant was
admitted to Garland Community Hospital on November 3, 1998, that A[Appellant] comes in on medications of
Valium, BuSpar, Klonopin
and Dilantin that was stopped in 1991.@  
[Emphasis added].  On January 14,
1998, Appellant had an office visit with Dr. Wilson and the doctor=s staff completed a Medication Record
that reported:  ADilantin 100 mg TID DISCONT.@   The same form records three previous visits,
October 22, 1998, December 8, 1998, and December 22, 1998, but Dilantin is not listed on any of those dates, and on the
first visit, there is the notation:  ACharter has medication.@ 

The State also
introduced the medical records for his treatment on March 4, 1991, after
Appellant had a seizure while driving his mother=s
car and drove off the road into a creek. 
Of significance, these medical records noted that Appellant had stated
that he had stopped taking Dilantin the week before
the accident because he Ahad
stopped having seizures.@  On a Patient Admission Assessment form completed
on November 3, 1998, at Garland Community Hospital, in the medications section,
it too stated that Appellant reported that he had stopped taking Dilantin and Klonopin in
1991.  Additionally, the Nursing Chart
taken on January 7, 1999, at Colombia Medical Center in McKinney, where
Appellant was taken following the accident, states that Appellant reported past
seizures and that he stopped Ataking
Dilantin & Clonadine in
1990.@








Finally, while the
testimony at trial provides anecdotal examples that he was a man who could
function Amore or
less@ on his
own, a composite of his medical condition can be found in the medical
records.  These records establish that
Appellant suffered two severe brain trauma accidents resulting in skull
depression fractures, loss of skull bone and insertion of a metal plate, atrophy
at the temporal lobes of the brain, and a classification as low grade
mentality.  He has a speech deficit, a
cognitive deficit, a wide-spaced gait, and suffers from both post-seizure
syndrome and post-head trauma syndrome.

Standard of Review

Appellant
complains of the sufficiency of the evidence to find the culpable mental state
alleged in the indictment.  He prays only
for a reversal and acquittal of his conviction, accordingly we must treat his
issue as a challenge to the legal sufficiency of the evidence.   

The standard of
review is well established.  We must
examine all of the evidence in a light most favorable to the verdict in order
to determine whether any rational trier of fact could
find the essential elements of the crime as alleged beyond a reasonable
doubt.  See Dewberry
v. State, 4 S.W.3d 735, 740 (Tex.Crim.App. 1999);
Lyon v. State, 885 S.W.2d 506, 516 (Tex.App.--El
Paso 1994, pet. ref=d).  Our duty is not to reexamine the evidence and
impose our own judgment as to whether the evidence establishes guilt beyond a
reasonable doubt, but only to determine if the findings by the trier of fact are rational. 
See Lyon, 885 S.W.2d at 516-17.  Any inconsistencies in the evidence are
resolved in favor of the verdict.  See
Matson v. State, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991). 
This standard of review applies equally to both direct and
circumstantial evidence cases.  See Geesa v. State, 820 S.W.2d 154, 161 (Tex.Crim.App. 1991); Garcia v. State, 871 S.W.2d
279, 280 (Tex.App.--El Paso 1994, no pet.). 








A manslaughter
conviction requires proof that appellant acted Arecklessly@ and Acause[d]
the death of an individual.@  See Tex.Pen.Code Ann. '
19.04(a)(Vernon 1994). 
A person acts recklessly when he is aware of but consciously disregards
a substantial and unjustifiable risk that the circumstances exist of the result
will occur.  Tex.Pen.Code Ann. '
6.03(c)(Vernon 1994). 
Generally, culpable mental conduct is proven through circumstantial
evidence.  See Dillon v. State, 574 S.W.2d 92, 94 (Tex.Crim.App.
1978).  It is inferred from the acts,
words, and conduct of the accused and the surrounding circumstances.  See Ledesma v.
State, 677 S.W.2d 529, 531 (Tex.Crim.App.
1984).

Discussion

The gravamen then is whether a rational fact finder could have
found Appellant demonstrated a realization of the imminence of danger and a
conscious and unjustifiable disregard of the danger when he decided to drive
his car prior to the fatal accident.  The
indicia of recklessness presented in this appeal are essentially three separate
acts:  (1) failing to take prescribed
anti-epileptic medicine; (2) driving contrary to medical instructions against
driving; and (3) driving knowing of his propensity to have seizures.[1]  








It is undisputed
that Appellant is prone to seizures.  He
was prescribed Dilantin for his seizures in 1989 and
he stopped taking it in 1991.  On October
11, 1998, he suffered a seizure and was given a prescription for Dilantin and instructions not to drive until okayed by a neurologist. 
That same day he filled the prescription, which provided enough pills to
last three months.  What was not brought
out in the trial or even on appeal, was that Appellant was admitted to what
appears to be a drug and alcohol rehabilitation hospital, Charter Hospital, on
the very next day--October 12, 1998.  This date is established by a single, obscure
entry on the Patient Admission Assessment taken at Garland Community Hospital
on November 3, 1998.  That same form
suggests that he was discharged on October 25; however, Dr. Wilson=s notation of a Afollow
up post hospital@ office
visit on October 22 suggests an early date. 
Regrettably, the medical records from Charter Hospital were not
introduced at trial.

As
important as the date of admission is another fact recorded by the Garland
Community Hospital.  Appellant had
been taking Valium and two other drugs at Charter Hospital and he had his last
dose on October 25.

Consequently,
following the October 11 seizure, Appellant was in the Charter Hospital from
October 12 to about the 22nd or 25th of that month.  He was then admitted to Garland Community
Hospital on November 3 and was hospitalized for four days.  Between November 7, 1998,
the day he was discharged from the Garland hospital, until the day of the fatal
accident, Appellant had at least eight medical office visits.

Shortly after the
accident, Appellant told one paramedic that he was on seizure medicine, but Ahad been out of it for a couple of
weeks.@  Yet, the record shows that he filled the Dilantin prescription on October 11 for 100 pills, more
than a three-month supply.  Then, only
moments later, he reportedly told another paramedic that he had taken himself
off the seizure medicine because he had not had a seizure.  Interestingly, that was the same reason he
had given to emergency room nurses at the time of the 1991 accident. 








At trial, Dr.
Wilson=s
testimony provided a strong inference that Appellant on his own had
discontinued taking the Dilantin that Dr. Touchy had
prescribed.  However, Appellant=s admission to Charter Hospital the day
after filling Dr. Touchy=s
prescription belies that inference.  In
the Progress Note dated October 22, 1998, Dr. Wilson stated:  A[Appellant]
was previously on Dilantin however the Dilantin was removed.@  [Emphasis added].  While we do not have the favor of the Charter
Hospital records, we do note from the Physician=s
Desk Reference that Adrugs
which may increase phenytoin serum levels [Dilantin] include . . . diazepam [Valium] . . . .@ 
PDR, 57th Ed. 2531, 2533 (2003).  Consequently, a strong inference can be drawn
that when Appellant was admitted to Charter Hospital for his alcoholism, he was
removed from Dilantin and prescribed Valium, which is
also an anti-epileptic drug.  Id. at 2964.  Moreover, the medical records entries from
October 23, 1998 through January 14, 1999, a week after the accident, all show
that Appellant=s general
compliant was with his numerous prescriptions. 
All of the medical records subsequent to Appellant=s October 11, 1998 seizure are
post-Charter Hospital and nowhere indicate that Appellant had a current
prescription for Dilantin until January 14, 1999.

Failing to take Prescribed Anti-epileptic Medicine

Consequently,
viewing all of the evidence, but in the light most favorable to the jury=s verdict, we conclude that there is
simply no evidence that Appellant=s
discontinuation of the 

anti-epileptic
medicine prescribed by Dr. Touchy was done in conscious disregard of a
substantial and justifiable risk. 
Rather, it seems apparent that in the intervening weeks between October
11, 1998 and January 7, 1999, a number of medical hands simply overlooked or
ignored Appellant=s history
of seizures and Dr. Touchy=s
prescription.  

Driving contrary
to Medical Instructions; and 

Driving Knowing of
his Propensity to have Seizures

 








While Appellant=s mental ability to appreciate
appropriately the medical instructions not to drive until okayed by a
neurologist are debatable, particularly given the host of intervening medical
treatments and his cognitive abilities, there are, unfortunately, no
psychological mental assessments or findings that grace this record.  Yet, there is a distinct feeling gained that
Appellant=s mental
processing is analogous to the accounting term, LIFO--Last In First Out,  that is, Appellant=s general compliance with the last set
of medical instructions given.  However,
it is abundantly clear from the record that Appellant should not have been
driving.  He has a history of past
automobile accidents caused by his susceptibility to seizures.  Especially critical is inferential evidence
that he avoided or misrepresented his medical condition on his driver=s license renewal application, evidence
which tends to show conscious disregard of the danger to other motorists and
the public because he knew that he could lose physical control over his
body.  Further, his decision to drive on
January 7, 1999 was a conscious choice in disregard of the unjustifiable danger
his driving posed.  Appellant=s single issue is overruled.  

The judgment of
the trial court is affirmed.  

 

 

January
30, 2003

DAVID WELLINGTON
CHEW, Justice

 

Before Panel No. 1

Larsen, McClure, and Chew, JJ.

 

(Publish)











[1]
The State also argues that simply having the seizure amounts to an act of recklessness.  We disagree. 
AAn
epileptic seizure while driving and an ensuing fatal accident is an example law
school textbooks use to distinguish cases in which there is no criminal
culpability from those in which there is criminal responsibility.@ 
See Commonwealth of Pennsylvania v. Cheatham,
615 A.2d 802, 806 (Pa.Super. 1992).